

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-24-2002

# Tenafly Eruv Assn v. Tenafly

Precedential or Non-Precedential: Precedential

Docket No. 01-3301

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Tenafly Eruv Assn v. Tenafly" (2002). *2002 Decisions.* Paper 667.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/667

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3301

TENAFLY ERUV ASSOCIATION, INC.;
CHAIM BOOK; YOSIFA BOOK;
STEPHANIE DARDICK GOTTLIEB;
STEPHEN BRENNER,

     Appellants

v.

THE BOROUGH OF TENAFLY;
ANN MOSCOVITZ, individually and
in her official capacity as Mayor
of the Borough of Tenafly;
CHARLES LIPSON; MARTHA B KERGE;
RICHARD WILSON; ARTHUR PECK;
JOHN T. SULLIVAN, each individually
and in their official capacities as
Council Members of the Borough of Tenafly

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 00-cv-06051)
District Judge: Honorable William G. Bassler

Argued March 21, 2002

Before: NYGAARD, ROTH and AMBRO, Circuit Judge s

(Opinion filed October 24, 2002)

Robert G. Sugarman, Esquire
 (Argued)
Harris J. Yale, Esquire
Craig L. Lowenthal, Esquire
Weil, Gotshal & Manges
767 Fifth Avenue, 27th Floor
New York, NY 10153

Richard D. Shapiro, Esquire
Hellring, Lindeman, Goldstein &
 Siegal
One Gateway Center, 8th Floor
Newark, NJ 07102

Nathan Lewin, Esquire (Argued)
Alyza D. Lewin, Esquire
Mintz, Levin, Cohn, Ferris,
 Glovsky & Popeo

701 Pennsylvania Avenue,
 N.W., Suite 900
Washington, D.C. 20004

 Attorneys for Appellants

Bruce S. Rosen, Esquire
McCusker, Anselmi, Rosen, Carvelli
 & Walsh
127 Main Street
Chatham, NJ 07928

Walter A. Lesnevich, Esquire
Lesnevich & Marzano-Lesnevich
15 West Railroad Avenue
Tenafly, NJ 07670

Noah R. Feldman, Esquire (Argued)
New York University Law School
40 Washington Square South
New York, NY 10012

 Attorneys for Appellees

2

Kevin J. Hasson, Esquire
Anthony R. Picarello, Jr., Esquire
Roman P. Storzer, Esquire
Derek L. Gaubatz, Esquire
The Becket Fund for Religious
 Liberty
1350 Connecticut Avenue, N.W.,
 Suite 605
Washington, D.C. 20036

Nathan J. Diament, Esquire
Union of Orthodox Jewish
 Congregations
1640 Rhode Island Avenue, N.W.
Washington, D.C. 20036

Abba Cohen, Esquire
Agudath Israel of America
1730 Rhode Island Avenue, Ste. 504
Washington, D.C. 20036

David Zwiebel, Esquire
Mordechai Biser, Esquire
Agudath Israel of America
42 Broadway, 14th Floor
New York, NY 10004

Ronald K. Chen, Esquire
Rutgers Constitutional Litigation
 Clinic
123 Washington Street
Newark, NJ 07102

          Edward Barocas, Esquire
          J.C. Salyer, Esquire
          American Civil Liberties Union of
           New Jersey Foundation
          35 Halsey Street, Suite 4B
          Newark, NJ 07102

           Attorneys for Amicus-Curiae

OPINION OF THE COURT

AMBRO, Circuit Judge:

The primary issues presented in this appeal from the District Court's order denying preliminary injunctive relief are whether the Free Speech and Free Exercise Clauses of the First Amendment allow the Borough of Tenafly, New Jersey, which has permitted various secularly motivated violations of a facially neutral ordinance, to invoke that ordinance against comparable religiously motivated acts by Orthodox Jews. Because there is no evidence that the acts in question are expressive, we hold that the Free Speech Clause does not apply. We further hold, however, that the Borough's selective enforcement of its ordinance likely violated the Free Exercise Clause. Because the other requirements for injunctive relief are satisfied, we reverse and direct the District Court to issue a preliminary injunction.

I. Background

An ordinance in the Borough of Tenafly, which encompasses 4.4 square miles and has a population of 13,806,[1] provides in pertinent part: "No person shall place any sign or advertisement, or other matter upon any pole, tree, curbstone, sidewalk or elsewhere, in any public street or public place, excepting such as may be authorized by this or any other ordinance of the Borough." Tenafly, N.J., Ordinance 691 Article VIII(7) (1954).[2]  Although Ordinance 691 does not allow Borough officials to make exceptions on a case-by-case basis, in practice they have often done so. House number signs nailed to utility poles in plain view are

_____

1. See Borough of Tenafly, About Tenafly, at http://www.tenaflynj.org/about.htm (last visited September 20, 2002).

2. Our description of the facts is based on our independent review of the record because, as explained in more detail below, the First Amendment bars us from deferring to the District Court's factual findings unless they involve witness credibility. See Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 567 (1995).

frequently left in place. Local churches are tacitly allowed to

post permanent directional signs bearing crosses on municipal property. Lost animal signs and other private postings often remain undisturbed by Borough officials. Orange ribbons were affixed to utility poles "for a lengthy period of time" by supporters of the local high school during a protracted controversy over school regionalization, but Borough officials made no effort to remove them. Every year, officials in the small community permit the local Chamber of Commerce to affix holiday displays to the Borough's utility poles for approximately six weeks during the Christmas holiday season. Red ribbons, wreaths, and seasonal holiday lights are attached to the Borough's utility poles as part of these displays.

The plaintiffs in this case are Orthodox Jewish residents of Tenafly[3] whose faith forbids them from pushing or carrying objects outside their homes on the Sabbath or Yom Kippur.[4] In accordance with a religious convention practiced by Orthodox Jews for over two thousand years, however, the plaintiffs believe they may engage in such activities outside their homes on the Sabbath within an eruv, a ceremonial demarcation of an area. Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 155 F. Supp. 2d 142, 146 (D.N.J. 2001). An eruv extends the space within which pushing and carrying is permitted on the Sabbath beyond the boundaries of the home, thereby enabling, for example, the plaintiffs to push baby strollers and wheelchairs, and carry canes and walkers, when traveling between home and synagogue. Without an eruv Orthodox Jews who have small children or are disabled typically cannot attend synagogue on the Sabbath.

---

3. Tenafly Eruv Association, Inc. ("TEAI") is an organization formed to promote the creation of an eruv in Tenafly. Chaim Book, Yosifa Book, and Stefanie Dardik Gotlieb live in Tenafly. At the time of briefing in this appeal, Stephen Brenner was not a Tenafly resident, but was building a house in Tenafly and planned to move there once it was completed. For simplicity, we refer to TEAI and the individual plaintiffs collectively as "the plaintiffs" throughout this opinion.

4. For simplicity, we refer throughout the remainder of our opinion only to the Sabbath.

Centuries ago, an eruv would be built using ropes and wooden poles. Today, Orthodox Jews can construct an eruv by attaching lechis--thin black strips made of the same hard plastic material as, and nearly identical to, the coverings on ordinary ground wires--vertically along utility poles. Along with preexisting horizontal overhead utility lines, the lechis designate an eruv's boundaries.[5] Unless one knows which black plastic strips are lechis and which are utility wires, it is "absolutely impossible" to distinguish the two. Id. at 149. Throughout this litigation, the plaintiffs have maintained that an eruv (as well as each constituent lechi) is "not a religious symbol," but rather is an item with "religious significance." Id. at 148.

On June 1, 1999, Erez Gotlieb and Gary Osen, two Orthodox Jews who are not parties to this case, met with Tenafly Mayor Ann Moscovitz to discuss creating an eruv in the Borough. Gotlieb and Osen met with Moscovitz because under Orthodox Jewish law an eruv is not valid unless a civil official with jurisdiction over the circumscribed area issues a ceremonial proclamation "renting" the area for a nominal fee (e.g., one dollar). The Mayor said she lacked authority to issue the requested proclamation, but agreed to bring the matter to the attention of the Borough Council, the Borough's legislative branch.6 She did not mention Ordinance 691 or suggest that affixing lechis to utility poles might violate any other ordinance.

At the next Council meeting, on July 8, 1999, the Council and approximately thirty Tenafly residents debated whether the Borough should grant the proclamation. Many of those present expressed vehement objections prompted by their fear that an eruv would encourage Orthodox Jews to move to Tenafly. A Council member whom the District Court was unable to identify noted "a concern that the

_____

5. Many major cities across the United States--such as Washington, D.C., New York, Chicago, Philadelphia, Los Angeles, Baltimore, Atlanta, and Cincinnati--have one or more eruvs. Both the White House and the United States Supreme Court are within the boundaries of an eruv.

6. Six Council members compose the Borough's legislative branch. The Mayor does not participate in lawmaking unless the Council is deadlocked, in which case she casts the tie-breaking vote.

Orthodoxy would take over" Tenafly. Id. at 151-52. One Council member voiced his "serious concern" that "Ultra-Orthodox" Jews might "stone[ ] cars that drive down the streets on the Sabbath." Id. at 153-54. The Borough Attorney participated in the debate. Neither he nor anyone else mentioned Ordinance 691 or indicated that attaching lechis to utility poles might be unlawful.

The Council decided to demand a formal, written proposal before voting on whether to issue the proclamation. Mayor Moscovitz advised Gotlieb and Osen, who did not attend the meeting, that the Council was unlikely to grant their request for a proclamation, but invited them to submit a formal application. Frustrated by the Borough's reticence, in August 1999 TEAI asked Bergen County Executive William P. Schuber, whose jurisdiction includes Tenafly, to issue the ceremonial proclamation necessary to validate the eruv. On December 15, 1999, he did so. The constitutionality of this action is not challenged in this case, and neither Schuber nor any other Bergen County official is a party.

Verizon, the local telephone company, owns the utility poles in Tenafly, though the poles are located on the

Borough's property.7 In April 2000, the plaintiffs asked Verizon for permission to attach lechis to its utility poles. The plaintiffs said in a sworn statement, which the District Court found "credible," that they did not believe any municipal ordinance prohibited them from doing so, and thus that they did not need the Council's permission. Id. at 155. After the plaintiffs informed Verizon about the proclamation, they say, the company's in-house counsel researched whether municipal approval was required and advised the plaintiffs that it was not.

In June 2000 Cablevision, holder of the local cable television franchise, volunteered to help the plaintiffs affix lechis to Verizon's utility poles as a community service. With the help of Cablevision personnel and equipment, an

_____

7. When some of the events pertinent to this case occurred, the company now known as Verizon was named Bell Atlantic Telephone Company. 155 F. Supp. 2d at 154-55. For convenience we refer to it as Verizon throughout.

eruv was completed in Tenafly sometime in September 2000.8 The plaintiffs represent, and the Borough does not disagree, that only private funds have supported the eruv and that no municipal assistance of any kind will be needed to maintain it.

Borough officials apparently did not learn that an eruv was being erected in Tenafly until late August 2000. Mayor Moscovitz and Councilman Charles Lipson met with two local Jewish leaders on September 14, 2000, to discuss the matter. One of the Jewish leaders perceived some of the Mayor's remarks as derogatory toward Orthodox Jews, and the meeting was unproductive. Twelve days later, Borough Administrator Joseph DiGiacomo, acting at the Mayor's behest, asked Cablevision why it helped attach the lechis without the Borough's permission. According to DiGiacomo, the company told him that "a Rabbi" had advised it that TEAI had the necessary government approval. Id. at 158. On October 10, 2000, Mayor Moscovitz and the Council directed the Borough Administrator to ask Cablevision to remove the lechis from the utility poles"as soon as possible." Id.

On October 23, 2000, Cablevision wrote to the plaintiffs and informed them that the Borough instructed it to take down the lechis. Cablevision said it would begin complying with the Borough's order within three days unless the plaintiffs demonstrated they had municipal approval. Counsel for the plaintiffs subsequently negotiated from the Borough a thirty-day reprieve to give TEAI an opportunity to apply for permission from the Council to maintain the eruv. The letter setting out this agreement, sent by the plaintiffs' counsel to Borough Attorney Walter Lesnevich, states in part: "I also appreciate your advice that the Borough has no specific ordinance covering this matter or

any particular format for the Eruv Association to follow in submitting its request." Id. at 159. By the beginning of November 2000, neither Lesnevich nor any other Borough

_____

8. According to the District Court, a map of Tenafly, which does not appear in the appellate record, "suggests" that the eruv enables the plaintiffs to push and carry objects in 35-40% of the Borough. 155 F. Supp. 2d at 149.

official had raised the possibility that Ordinance 691 or another ordinance might be relevant to the dispute over the lechis.

On November 7, 2000, the plaintiffs filed their application with the Borough, asking the Council not to remove or order the removal of the lechis. On November 21, 2000, the Council decided to hold two hearings to allow members of the public to comment on the plaintiffs' proposal. The Council scheduled the first hearing for November 28, 2000, and the second for December 12, 2000. Fifty-four members of the public, including plaintiff Chaim Book and other eruv proponents, spoke at the two hearings. The speakers were evenly divided between supporters and opponents of the eruv. During the hearings, Council members did not express their views until the conclusion of the December 12 hearing. At that hearing, just before the Council voted on the plaintiffs' application, one Councilman stated that "[t]o the best of my knowledge," the Borough had "no ordinance, no resolution that says that you cannot hang something from a utility pole." Mayor Moscovitz responded by saying "[t]here is an ordinance," and Lesnevich then described Ordinance 691. This exchange was apparently the first time that Borough officials mentioned Ordinance 691 with regard to the lechis.

Shortly after Lesnevich brought Ordinance 691 to the Council members' attention, the Council voted 5-0 to force the plaintiffs to remove the lechis.[9] The next day, the Borough ordered Cablevision to take the lechis off the utility poles "as soon as possible." 155 F. Supp. 2d at 163. The plaintiffs responded by suing in the District Court on December 15, 2000, alleging violations of the First and Fourteenth Amendments, 42 U.S.C. SS 1983 and 1985, and the Fair Housing Act ("FHA"), 42 U.S.C. S 3604(a), and seeking an injunction barring the Borough from interfering with the eruv.[10]

_____

9. One Council member was not present and thus did not vote.

10. The plaintiffs did not allege an Equal Protection Clause violation. In addition, though not relevant to this appeal, the plaintiffs sought compensatory damages and attorneys' fees.

Pursuant to Federal Rule of Civil Procedure 65(b), the District Court issued a temporary restraining order precluding the Borough from disturbing the eruv . Consent orders extended the duration of the restraint until the Court ruled on the plaintiffs' request for a preliminary injunction. After the parties completed limited discovery, the Court held an evidentiary hearing that spanned four days, received additional affidavits, and heard oral arguments. On August 10, 2001, the Court issued an opinion denying the plaintiffs' request for injunctive relief on the ground that they are not reasonably likely to succeed on the merits of any of their claims.

The District Court's discussion began with the plaintiffs' claim that the Borough violated the First Amendment's Free Speech Clause. The Court concluded (albeit without citing our decision in Troster v. Pennsylvania State Department of Corrections, 65 F.3d 1086 (3d Cir. 1995)) that the act of affixing lechis to utility poles is "symbolic speech." 155 F. Supp. 2d at 173. Next the Court determined that the Borough's utility poles are a nonpublic forum, and that the Borough did not discriminate against the plaintiffs' religious viewpoint when it ordered the lechis removed. Id. at 174-80. The Court acknowledged that the Borough had expressly or tacitly permitted various facial violations of Ordinance 691,11 such as the holiday displays and church directional signs. But it distinguished the lechis, reasoning that the other materials affixed to the utility poles served commercial or functional purposes, were not religious in nature, and were not intended to be attached permanently. Id. at 176-78. Other items frequently affixed to utility poles in violation of Ordinance 691, such as the lost animal signs and permanently attached house numbers, did not show discriminatory enforcement because the Borough said it made efforts to remove some of them after the plaintiffs sued. Id. at 177-78. As for the orange ribbons, the Court

_____

11. The Borough submitted a copy of a separate ordinance that prohibits posting signs on utility poles. The Borough has not suggested, either to the District Court or to our Court, that its decision to remove the lechis was based on that ordinance. Instead, it has maintained throughout this litigation that its decision was based only on Ordinance 691. See, e.g., 155 F. Supp. 2d at 159-60.

10

stated that, notwithstanding Mayor Moscovitz's testimony and other evidence in the record, it "lack[ed] sufficient information" to find that the Borough knew about and tacitly approved them. Id. at 177. The Court concluded that the Borough's application of the ordinance did not discriminate against the plaintiffs' religious viewpoint, and thus their free speech claim could not succeed. Id. at 180.

The District Court also rejected the plaintiffs' claim that the Borough violated the First Amendment's Free Exercise Clause. Id. at 180-86. The Court disagreed with the

plaintiffs' position that the objective effect of the Borough's decision was to discriminate against religiously motivated activity. It noted that, under Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439 (1988), the Borough can deny access to utility poles on its land for a religion-neutral reason even if doing so imposes an "incidental" burden on Orthodox Jews' ability to practice their religion. 155 F. Supp. 2d at 180-81. The Court reasoned that because the Borough ordered the lechis taken down pursuant to Ordinance 691, "a pre-existing, neutral law of general applicability," the issue was controlled by the Supreme Court's ruling in Employment Division v. Smith, 494 U.S. 872 (1990), rather than by its subsequent decision in Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993). 155 F. Supp. 2d at 181. The Court did not consider whether its earlier conclusion that Borough officials chose not to enforce Ordinance 691 with respect to some secularly motivated commercial and functional postings, see id. at 177-80, affected the free exercise analysis. Under Smith , the District Court reasoned, the Borough Council's decision to enforce Ordinance 691 against the eruv had an objectively neutral effect that did not implicate the Free Exercise Clause. Id.

The Court thought, however, that the Council members' improper subjective motivations nonetheless necessitated strict scrutiny under Lukumi. Id. at 183. It found that, while the Council members had no religious animosity, they acted because of the "constitutionally impermissible" fear that the eruv would facilitate the formation of an insular Orthodox Jewish "community within a community" in Tenafly. Id. at 182-83. Nevertheless, no Free Exercise

11

Clause violation occurred because the Council members' decision was "narrowly tailored to further their interest in avoiding the appearance of an Establishment Clause concern." Id. at 184 n.26 (emphasis added).

Finally, the Court held that the plaintiffs lack standing to sue under the FHA because the Borough did not "make unavailable or deny" housing within the meaning of the relevant provision, 42 U.S.C. S 3604(a). Id. at 186-90. Every case finding a violation of S 3604(a), the District Court noted, involved conduct that "directly affected the availability of housing," whereas the plaintiffs seek a "non-housing use of municipal property." Id. at 187.

The Court concluded that, because the plaintiffs were not reasonably likely to succeed on any of their claims, injunctive relief was not appropriate. The plaintiffs timely appealed, giving us jurisdiction pursuant to 28 U.S.C. S 1292(a)(1),12 and we granted their request for an injunction prohibiting removal of the lechis pending our decision. Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, No. 01-3301 (3d Cir. Sept. 19, 2001) (order).

II. Standard of Review

We review the District Court's ultimate decision to deny
a preliminary injunction for abuse of discretion. See Dam
Things from Denmark, a/k/a Troll Co. ApS, v. Russ Berrie &
Co., 290 F.3d 548, 556 (3d Cir. 2002); St. Thomas-St. John
Hotel & Tourism Ass'n, Inc. v. Virgin Islands, 218 F.3d 232,
235 (3d Cir. 2000). But "'any determination that is a
prerequisite to the issuance of an injunction . . . is reviewed
according to the standard applicable to that particular
determination."' Southco, Inc. v. Kanebridge Corp., 258 F.3d
148, 150-51 (3d Cir. 2001) (quoting Am. Tel. & Tel. Co. v.
Winback and Conserve Program, Inc., 42 F.3d 1421, 1427
(3d Cir. 1994)). Thus "we exercise plenary review over the
District Court's conclusions of law and its application of the
law to the facts."' Id. at 151 (quoting Duraco Prods., Inc. v.
Joy Plastic Enters., Ltd., 40 F.3d 1431, 1438 (3d Cir.
1994)).

_____

12. The District Court had jurisdiction under 28 U.S.C. SS 1331 and
1343.

Ordinarily we will not disturb the factual findings
supporting the disposition of a preliminary injunction
motion in the absence of clear error. See Fed. R. Civ. P.
52(a); Novartis Consumer Health, Inc. v. Johnson & Johnson-
Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir.
2002); S. Camden Citizens in Action v. N.J. Dep't of Envtl.
Protection, 274 F.3d 771, 777 (3d Cir. 2001). This case,
however, involves First Amendment claims, and "the
reaches of the First Amendment are ultimately defined by
the facts it is held to embrace." Hurley v. Irish-American
Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557,
567 (1995). Therefore, we have "a constitutional duty to
conduct an independent examination of the record as a
whole," and we cannot defer to the District Court's factual
findings unless they concern witnesses' credibility. Id.; Bose
Corp. v. Consumers Union of United States, Inc., 466 U.S.
485, 499, 510-11 (1984); Christ's Bride Ministries, Inc. v.
Southeastern Pa. Transp. Auth., 148 F.3d 242, 247 (3d Cir.
1998). Accordingly, we examine independently the facts in
the record and "draw our own inferences" from them.
Christ's Bride, 148 F.3d at 247.

III. Discussion

Four factors governed the District Court's decision
whether to issue a preliminary injunction barring the
Borough from removing the eruv. To obtain an injunction,
the plaintiffs had to demonstrate (1) that they are
reasonably likely to prevail eventually in the litigation and
(2) that they are likely to suffer irreparable injury without
relief. See S. Camden Citizens, 274 F.3d at 777; Adams v.
Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir. 2000). If
these two threshold showings are made the District Court
then considers, to the extent relevant, (3) whether an
injunction would harm the Borough more than denying

relief would harm the plaintiffs and (4) whether granting relief would serve the public interest. See S. Camden Citizens, 274 F.3d at 777; Freedom Forge, 204 F.3d at 484. Because the District Court ended its analysis after concluding that the plaintiffs did not show that their claims are reasonably likely to succeed, see 155 F. Supp. 2d at 171, 191, our discussion focuses on that factor. Disposing

13

of the plaintiffs' FHA claim in the margin,13 we will first

_____

13. We can dispense quickly with the plaintiffs' contention that they have a valid FHA claim. One necessary element of a cause of action under the FHA is that the plaintiffs must be "aggrieved person[s]," 42 U.S.C. S 3613(a)(1)(A), which in this context means victims of "a discriminatory housing practice," id. S 3602, that"make[s] unavailable or den[ies]" housing to them based on their religion. Id.S 3604(a). Some of the plaintiffs lived in the Borough before the eruv  was established. 155 F. Supp. 2d at 188. Therefore, while the plaintiffs claim that the Borough wants to remove the eruv to discourage Orthodox Jews from moving into town, they do not claim that removing the eruv  would make housing within the Borough "unavailable" to them. Instead, they argue that removing the eruv would make their living in the Borough much less desirable. But they concede that the Borough's decision did not directly affect anyone's current or future home. To our knowledge, no court has stretched the "make unavailable or deny" language of S 3604(a) to encompass actions that both (1) do not actually make it more difficult (as opposed to less desirable) to obtain housing and (2) do not directly regulate or zone housing or activities within the home. See, e.g., LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 424 (2d Cir. 1995) (stating that the pertinent language "has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions"); South-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors, 935 F.2d 868, 882 (7th Cir. 1991) (stating that the relevant language of S 3604(a) applies to "actions by individuals or governmental units which directly affect the availability of housing") (internal quotation marks omitted). We believe that expanding S 3604(a) as the plaintiffs suggest is unwarranted, as it would "create an FHA claim in every circumstance where a religious group is denied a request to use municipal property to make an area more appealing for the private practice of their religion," even if the municipal action has nothing to do with housing. 155 F. Supp. 2d at 189.

We note, however, that we do not agree with the Borough's contention --and the District Court's acquiescence, if its use of the word "standing" was meant to signify a perceived lack of subject-matter jurisdiction over the plaintiffs' FHA claim--that the issue is jurisdictional. When the presence or absence of a cause of action depends on how statutory language is interpreted (as the plaintiffs' FHA claim does), the absence of a valid statutory cause of action does not preclude jurisdiction unless the claim is frivolous or a transparent attempt to manufacture federal-court jurisdiction where none existed. See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 122 S. Ct. 1753, 1758-59 (2002); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998); Bell v. Hood, 327 U.S. 678, 682-85 (1946). Because the plaintiffs' FHA claim is neither, we have

14

consider the plaintiffs' free speech claim and then discuss
their free exercise claim.14

A. The Free Speech Claim

The First Amendment's Free Speech Clause provides that
"Congress shall make no law . . . abridging the freedom of
speech." U.S. Const. amend. I. "Speech" is not construed
literally, or even limited to the use of words. Constitutional
protection is afforded not only to speaking and writing, but
also to some nonverbal acts of communication, viz.,
"expressive conduct" (or "symbolic speech"). Affixing lechis
to utility poles does not involve the use of words, so the
plaintiffs' behavior is protected by the Free Speech Clause
only if it constitutes expressive conduct.15

---

jurisdiction to consider it. See Growth Horizons, Inc. v. Delaware County,
983 F.2d 1277, 1280-84 (3d Cir. 1993) (holding that district court's
determination that defendant did not "make unavailable or deny"
housing under S 3604(f) was "a judgment on the merits rather than a
jurisdictional decision" because the plaintiff's claim, though ultimately
unsuccessful, was not frivolous).

14. Citing Elber v. City of Newark, 256 A.2d 44 (N.J. 1969), the plaintiffs
attempt to raise a claim under New Jersey law. Presumably because the
plaintiffs did not include this claim in their complaint, the District Court
did not discuss it. We shall do likewise.

15. The Borough failed to contend in its brief that the act of affixing
lechis to utility poles is not "speech" within the meaning of the First
Amendment. Ordinarily we avoid addressing issues not raised in a
party's opening brief. See, e.g., Kirschbaum v. WRGSB Associates, 243
F.3d 145, 151 n.1 (3d Cir. 2001). However, "[w]hen an issue or claim is
properly before the court, the court is not limited to the particular legal
theories advanced by the parties, but rather retains the independent
power to identify and apply the proper construction of governing law."
Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991). Thus we "may
consider an issue 'antecedent to . . . and ultimately dispositive of ' the
dispute before [us], even an issue the parties fail to identify and brief."
United Nat'l Bank v. Indep. Ins. Agents, 508 U.S. 439, 447 (1993)
(quoting Arcadia v. Ohio Power Co., 498 U.S. 73, 77 (1990)) (omission in
original). Whether the Free Speech Clause applies is a threshold question
necessary to a proper analysis of the parties' arguments. Therefore, we
requested that the parties provide supplemental memoranda on the
issue, at which time the Borough initiated its argument that no
protected expression is involved here.

15

Conduct is protected by the First Amendment when "the
nature of [the] activity, combined with the factual context
and environment in which it was undertaken," shows that
the "activity was sufficiently imbued with elements of
communication to fall within the [First Amendment's]
scope." Spence v. Washington, 418 U.S. 405, 409-10 (1974);
Troster v. Pa. State Dep't of Corrections, 65 F.3d 1086, 1090

(3d Cir. 1995). Context is crucial to evaluating an expressive conduct claim because "the context may give meaning to the symbol" or act in question. Spence, 418 U.S. at 410.

Until 1995, the Supreme Court determined whether speech is "sufficiently imbued with elements of communication" by asking "whether '[a]n intent to convey a particularized message was present, and [whether] in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it."' Texas v. Johnson, 491 U.S. 397, 404 (1989) (quoting Spence, 418 U.S. at 410-11). Applying this two-prong test (the "Spence-Johnson test"), the Supreme Court held that the First Amendment shelters certain forms of nonverbal communication. For instance, Johnson held that burning an American flag as part of a demonstration against the Reagan Administration's policies that coincided with the 1984 Republican Party convention was "speech" because its "expressive, overtly political nature" was"both intentional and overwhelmingly apparent" to the protestors' audience. 491 U.S. at 399, 406. Similarly, Spence held that attaching a peace symbol to an American flag and displaying the "peace flag" upside down was protected expression. The actor "testified that he put a peace symbol on the flag and displayed it to public view as a protest against the invasion of Cambodia and the killings at Kent State University, events which occurred a few days prior to his arrest," and "it would have been difficult for the great majority of citizens to miss the drift of appellant's point at the time that he made it." 418 U.S. at 408, 410. Additional types of nonverbal communication have also been deemed constitutionally protected. See, e.g., Schacht v. United States, 398 U.S. 58, 62-63 (1970) (wearing United States military uniforms as part of theatrical presentation opposing Vietnam War); Tinker v. Des Moines Indep.

16

Community Sch. Dist., 393 U.S. 503, 505-06 (1969) (wearing black armband at school to protest Vietnam War); W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 632 (1943) (saluting the American flag to show allegiance to the United States); Stromberg v. California, 283 U.S. 359, 369 (1931) (displaying red flag to express opposition to organized government). In other cases, the Court assumed, without deciding, that the nonverbal political demonstrations at issue implicated the First Amendment. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984) (sleeping in a public park in front of the White House and on the Washington Mall, in the middle of winter, to protest homelessness); United States v. O'Brien, 391 U.S. 367, 376 (1968) (burning Selective Service registration certificate on courthouse steps to protest war).16

The Supreme Court's unanimous 1995 opinion, Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557 (1995), modified somewhat the test for determining when conduct constitutes "speech." In Hurley,

a group of gays, lesbians, and bisexuals of Irish ancestry
sued under a state public accommodations law barring
discrimination on the basis of sexual orientation in an
attempt to gain admission to a private St. Patrick's Day
parade in which an array of disparate groups participated.
While the parade organizers asserted their First
Amendment right to shape the content of their speech, the

---

16. Some Justices have viewed other examples of nonverbal political
protest as sufficiently communicative to receive First Amendment
protection. See Brown v. Louisiana, 383 U.S. 131, 142 (1966) (plurality
opinion) (finding that black citizens who silently assembled in public
library to protest segregated public facilities engaged in expressive
conduct); Garner v. Louisiana, 368 U.S. 157, 201 (1961) (Harlan, J.,
concurring in the judgment) (concluding that black persons who sat at
"white" lunch counters to protest segregated dining facilities were
engaging in symbolic speech and that their disturbing-the-peace
convictions, which the majority reversed on insufficient evidence
grounds, violated the First Amendment). In addition, the Supreme Court
recently recognized a symbolic speech claim in a different context. See
City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) (plurality opinion)
(stating summarily that nude erotic dancing is "expressive conduct,"
though "it falls only within the outer ambit of the First Amendment's
protection").

17

plaintiffs maintained that the organizers had no First
Amendment interest because their lack of selectivity in
accepting participants made it impossible for spectators to
discern a specific message. Rejecting the plaintiffs'
contention, the Supreme Court explained that "a narrow,
succinctly articulable message is not a condition of
constitutional protection, which if confined to expressions
conveying a 'particularized message,' would never reach the
unquestionably shielded painting of Jackson Pollak, music
of Arnold Schoenberg, or Jabberwocky verse of Lewis
Carroll."17 Id. at 569 (quoting Spence, 418 U.S. at 411).

By establishing that "a private speaker does not forfeit
constitutional protection simply by combining multifarious
voices, or by failing to edit their themes to isolate an exact
message as the exclusive subject matter of the speech,"
Hurley eliminated the "particularized message" aspect of the
Spence-Johnson test. Id. at 569-70. The Hurley Court had
no need to formulate a new test, however, because--unlike
conduct that is not normally communicative--parades are
inherently expressive. Id. at 568 ("Parades are thus a form
of expression, not just motion, and the inherent
expressiveness of marching to make a point explains our
cases involving protest marches."). Thus Hurley left open
how courts should evaluate symbolic speech claims.

Before Hurley, we treated the Spence-Johnson factors as
prerequisites for conduct to be deemed expressive. See
Steirer by Steirer v. Bethlehem Area Sch. Dist., 987 F.2d
989, 995, 997 (3d Cir. 1993) (holding that participating in
community service is not expressive conduct). But after

Hurley, our decision in Troster v. Pennsylvania State Department of Corrections, 65 F.3d 1086 (3d Cir. 1995), concluded that Spence (and, implicitly, Johnson as well) set signposts rather than requirements, and that its two factors can no longer be viewed as the only criteria. See id. at 1090 & n.1. Because Spence "contained no language of necessity," we adopted the following standard: conduct is

_____

17. The Hurley Court proceeded to hold that applying the public accommodations law to force the parade organizers to include the plaintiffs violated the organizers' First Amendment right to select the components of their message. Id. at 579.

18

expressive if, "considering 'the nature of[the] activity, combined with the factual context and environment in which it was undertaken,' we are led to the conclusion that the 'activity was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments."'18Id. at 1090 (quoting Spence, 418 U.S. at 409-10) (alteration in original). We emphasized that this "is a fact-sensitive, context-dependent inquiry," and that the putative speaker bears the burden of proving that his or her conduct is expressive. Id.

We then applied this formulation to reject a state corrections officer's claim that a regulation mandating that each corrections officer wear an American flag patch on his uniform's right shirt-sleeve, with the star field facing his rear, violated the First Amendment by compelling him to engage in expressive conduct. Id. at 1088. The officer believed that compulsory display debases the flag and that "displaying the flag with its star field to the rear signifies cowardice and retreat from the principles for which the flag stands." Id. Though we recognized the strength of the officer's convictions, we determined that he did not show that the act of wearing a flag patch was sufficiently communicative to receive First Amendment protection, as he did not present "evidence to support his otherwise bare

_____

18. Outside our Circuit, courts continue to view the Spence-Johnson test as the governing standard for determining whether conduct constitutes protected expression. See, e.g., Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198, 211 (1st Cir. 2002); Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 283 (5th Cir. 2001); Hutchins v. District of Columbia, 188 F.3d 531, 548 (D.C. Cir. 1999); Colacurcio v. City of Kent, 163 F.3d 545, 549 n.1 (9th Cir. 1998); Stephenson v. Davenport Cmty. Sch. Dist., 110 F.3d 1303, 1307 n.4 (8th Cir. 1997); United States v. Lewis, 2002 WL 31055185, *8 (S.D. W. Va. Sept. 11, 2002); Daly v. Harris, 215 F. Supp. 2d 1098, 1108 (D. Haw. 2002); Isaacs ex rel. Isaacs v. Bd. of Educ., 40 F. Supp. 2d 335, 336 (D. Md. 1999); Al-Almin v. City of New York, 979 F. Supp. 168, 172 (E.D.N.Y. 1997); Fighting Finest, Inc. v. Bratton, 898 F. Supp. 192, 195 (S.D.N.Y. 1995); Gallo v. County of Sonoma, 120 Cal. Rptr. 2d 550, 569 (Cal. Ct. App. 2002), State v. Machholz, 574 N.W.2d 415, 419-20 (Minn. 1998); Binkowski v. State, 731 A.2d 64, 70 (N.J. Super. Ct. App. Div. 1999); State v. Janssen, 580 N.W.2d 260, 266 n.11

(Wis. 1998); State v. Berrill, 474 S.E.2d 508, 516 (W. Va. 1996).

assertion that the flag patch regulation compels expressive conduct." Id. at 1091 n.4.

Our discussion in Troster focused on two inquiries. First, we examined whether the officer intended subjectively (i.e., actually intended) for his conduct to communicate to persons whom he expected to observe it (i.e., his intended audience). We determined that there was no proof that his conduct was "demonstrative of an attitude or belief" or that he "actually assert[ed] anything to anyone." Id. at 1091-92. Second, we considered whether observers understood the message the officer intended his conduct to convey. The record contained no evidence that "observers would likely understand the patch or the wearer to be telling  them anything about the wearers' beliefs" or "that the flag patch on the correctional officers' uniform will relay any message (ideological or otherwise) to anyone." Id.  at 1091-92 (emphases in original). Therefore, the officer's compelled speech claim failed because he did not show that the conduct in which he was forced to engage was expressive.

Our emphasis in Troster on the putative speaker's burden of proving that his conduct is "sufficiently imbued with elements of communication" is important to our resolution of the plaintiffs' expressive conduct claim in this case. If the putative speaker's burden were "limited to 'the advancement of a plausible contention' that [his or her] conduct is expressive"--a view espoused by a plurality of the D.C. Circuit but rejected by the Supreme Court in Clark --the result "would be to create a rule that all conduct is presumptively expressive." Clark, 468 U.S. at 293 n.5. Such a rule would be inconsistent with the Supreme Court's repeated admonition that "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech."' O'Brien, 391 U.S. at 376; see also Johnson, 491 U.S. at 404; Spence, 418 U.S. at 409. Therefore, as we stressed in Troster, 65 F.3d at 1091-92, and as the Supreme Court held in Clark, "it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." Clark, 468 U.S. at 293 n.5.

With this background as context, we conclude that the plaintiffs have not met their burden of showing that affixing

lechis to utility poles is "sufficiently imbued with elements of communication" to be deemed expressive conduct. The record indicates that the lechis were attached for the benefit of other Orthodox Jews, not the general public. Therefore, if the plaintiffs' conduct is expressive, their intended audience is other Orthodox Jews. But the plaintiffs have not introduced evidence that the lechis are meant to

demonstrate a belief or assert anything to Orthodox Jews or
that Orthodox Jews "likely understand" the eruv "to be
telling them anything," i.e., that they discern "any message
(ideological or otherwise)" from the lechis .19 Troster, 65 F.3d
at 1091 (emphases in original). Instead, on the record
before us, it appears that the eruv serves a purely
functional, non-communicative purpose indistinguishable,
for free speech purposes, from that of a fence surrounding
a yard or a wall surrounding a building.

Rather than "actually assert[ing] anything to anyone," id.
at 1092, it seems that the eruv simply demarcates the
space within which certain activities otherwise forbidden on
the Sabbath are allowed. Plaintiff Chaim Book described
the eruv as a "boundary" that "requires physical
demarcation," a function historically achieved by"rop[ing]
an area off." Similarly, at oral argument counsel for the
plaintiffs told us that the lechis "replace[ ] the pole[s] that
would be used prior to the time there were telephone poles"
to designate the eruv's boundaries. While the plaintiffs
describe the eruv in functional terms, explaining that it
establishes an area within which Orthodox Jews may
engage in certain otherwise impermissible activities, they
offer no evidence that it communicates anything. The only
evidence the plaintiffs introduced with respect to the
religious significance of the eruv was the affidavit of Rabbi
Hershel Schachter of Yeshiva University, an expert on
Orthodox Jewish law. Rabbi Schachter explained that the
eruv enables couples with young children and persons who
use wheelchairs to attend synagogue on the Sabbath. He
did not, however, suggest that the Orthodox Jews who affix

_____

19. As we stated above, see supra note 15, it appears that until we
requested briefing on the issue the parties merely assumed that the
lechis are protected by the First Amendment.

lechis intend to send any message thereby, or that the eruv
conveys any message to Orthodox Jews.

Further, there is no evidence that Orthodox Jews receive
a message or ascertain the eruv's boundaries by looking at
the lechis. To the contrary, Rabbi Howard Jachter, speaking
on behalf of the TEAI, said that "most Orthodox Jews do
not . . . would not know how to make an eruv, wouldn't see
where the eruv is, how it is. A rabbi wouldn't know how it
is." Even plaintiff Chaim Book, who is obviously familiar
with the eruv's boundaries and the lechis' locations, said, "I,
who know some of the poles have lechis, have a hard time
recognizing the lechi on the pole by just looking at it." In
addition, plaintiffs' complaint states that "the eruv is not a
religious symbol." Thus there is no evidence contradicting
the Borough's assertion at oral argument--which the
plaintiffs did not dispute--that Orthodox Jews learn the
eruv's boundaries by word of mouth from the persons
charged with erecting and inspecting it.

Even if the plaintiffs had introduced evidence that the lechis serve a boundary function, that would be insufficient to prove they are "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." Troster, 65 F.3d at 1090 (internal quotation marks omitted). All boundary lines delineate the realms within which certain activities are or are not allowed. For instance, the invisible boundary between Nevada and Utah separates an area where gambling is legal from one where it is not. A homeowner's fence demarcates where his neighbor's garden must stop. The walls of a synagogue delineate the space where congregational worship takes place. But geographical boundary lines, fences, and walls are simply not protected expression in the absence of evidence that some "attitude or belief," Troster, 65 F.3d at 1091, is conveyed or received from them. Cf. Dallas v. Stanglin, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes--for example, walking down the street or meeting one's friends at a shopping mall --but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."); Pro v. Donatucci, 81 F.3d 1283, 1293 (3d Cir. 1996) (Roth, J.,

22

dissenting) (noting that "expression and communication are the crucial attributes of speech," that "[n]owhere is this stress on expression and communication more clear than in the Court's approach to speech that falls outside the traditional domain of the spoken or written word," and that "[t]he classic examples of conduct-as-speech all contain patently expressive messages."). Otherwise, the act of constructing houses of worship would implicate the Free Speech Clause, whereas courts consistently analyze the constitutionality of zoning regulations limiting such construction under the Free Exercise Clause, not the Free Speech Clause. See, e.g., City of Boerne v. Flores, 521 U.S. 507, 534 (1997); Messiah Baptist Church v. County of Jefferson, 859 F.2d 820, 823-26 (10th Cir. 1988); Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, 699 F.2d 303, 307-08 (6th Cir. 1983); Church of Jesus Christ of Latter-Day Saints v. Jefferson County, 741 F. Supp. 1522, 1527-34 (N.D. Ala. 1990); cf. Congregation Kol Ami v. Abington Township, 2002 WL 31312280 (3d Cir. Oct. 16, 2002). Moreover, if solely the act of erecting a wall separating the interior of a building from the secular world constituted "speech," every religious group that wanted to challenge a zoning regulation preventing them from constructing a house of worship could raise a "hybrid" rights claim triggering strict scrutiny, see Employment Division v. Smith, 494 U.S. 872, 881-82 (1990),[20] a notion so astonishing that we are unaware of any court--or even any law review article--that has suggested it.

Plaintiffs maintain that, although the eruv is functional, it is also expressive, just as the 18-foot Chanukah menorah

20. As explained in more detail below, Smith held that the Free Exercise Clause offers no protection when a neutral, generally applicable law incidentally burdens religious practice, with a possible exception for "hybrid" rights situations in which both the right to free exercise of religion and another constitutional right are implicated. 494 U.S. at 879, 881-82. If the law imposing the burden on religious freedom is either not neutral or not generally applicable, however, it violates the First Amendment unless it satisfies strict scrutiny (i.e., unless it is narrowly tailored to advance a compelling government interest). See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993).

in Allegheny County v. Greater Pittsburgh ACLU , 492 U.S. 573 (1989), was expressive even though the functional purpose of menorahs is to hold candles. To the extent that the plaintiffs' point is that functionality and expression are "not mutually exclusive," we do not disagree; things ordinarily used for functional purposes can be used for communicative purposes as well. Name.Space, Inc. v. Network Solutions, Inc., 202 F.3d 573, 586 (2d Cir. 2000) (concluding that Internet domain names are ordinarily functional, but can be expressive if they contain a message, e.g., ".jones_for_president"). But there is no evidence that the eruv is an example of such overlapping purposes, whereas there was ample evidence to that effect in Allegheny. As part of a holiday display that stood at the entrance to a government building and included a 45-foot Christmas tree, the 18-foot menorah was both intended and understood to express "a recognition that Christmas is not the only traditional way of observing the winter-holiday season" and "an acknowledgment of Chanukah as a contemporaneous alternative tradition." Allegheny, 492 U.S. at 617-18.

In sharp contrast here, there is no evidence that Orthodox Jews intend or understand the eruv to communicate any idea or message. Rather, the evidence shows that the eruv--like a fence around a house or the walls forming a synagogue--serves the purely functional purpose of delineating an area within which certain activities are permitted.

We also reject the plaintiffs' contention that the eruv may be deemed expressive simply because some residents of Tenafly who are not Orthodox Jews discern various unintended messages emanating from it, notwithstanding that these persons would not be intended recipients even if the lechis were meant to send a message. To accept this position would mean that whether conduct is expressive depends entirely on how observers perceive it--even if the actor had no communicative intent, and even if the actor disapproves of the message (or messages) discerned by the observers. See Troster, 65 F.3d at 1092 (noting the difference between an observer's independent inference from an actor's behavior and an observer's receipt of a

nonverbal message intentionally sent by the actor); Peter
Meijes Tiersma, Nonverbal Communication and the Freedom
of "Speech", 1993 Wis. L. Rev. 1525, 1553, 1561-62 (stating
that nonverbal conduct is expressive only if it involves "a
conscious transfer of information," i.e.,"an attempt to
communicate" by the actor).

Finally, we cannot accept the plaintiffs' argument that, by
analogy to the protection afforded newsracks, the eruv is
protected under the First Amendment. Relying on City of
Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750 (1988),
the plaintiffs insist that, just as newsracks facilitate the
distribution of newspapers, the eruv facilitates religious
worship.21 But City of Lakewood did not treat newsracks as
protected based on the sweeping rationale that they
facilitate speech, but rather because they are inextricably
intertwined with speech. Id. at 768 ("The actual 'activity' at
issue here is the circulation of newspapers, which is
constitutionally protected."). Unlike a newsrack, which
facilitates the paradigm of communication (the sale of
newspapers), there is no evidence that the eruv  is
inextricably linked to a communicative activity. Instead, the
record shows that the eruv exists solely to designate the
boundaries within which Orthodox Jews can engage in
certain activities on the Sabbath. Therefore, City of
Lakewood does not support the plaintiffs' position that the
non-communicative act of delineating an area constitutes
protected expression.

In sum, as in Troster, the plaintiffs offer nothing more
than a "bare assertion" that their conduct is expressive.22
65 F.3d at 1091 n.4. Because this does not satisfy the
plaintiffs' burden of proof, their free speech claim fails.23

_____

21. City of Lakewood, the Supreme Court sustained a facial challenge to
an ordinance granting the mayor "unfettered discretion" to grant or deny
permits to place newsracks on public property. 486 U.S. at 772.

22. Our holding is limited to the record in this case and does not
necessarily preclude the possibility that a party in another case might
introduce evidence showing that attaching lechis  to utility poles is
conduct protected by the Free Speech Clause.

23. Accordingly, the plaintiffs cannot assert a"hybrid rights" claim under
the Free Exercise Clause. See infra note 26.

B. The Free Exercise Claim

1. Determining the appropriate level of scrutiny

The Free Exercise Clause, which binds the Borough
pursuant to the Fourteenth Amendment, see Cantwell v.
Connecticut, 310 U.S. 296, 303 (1940), provides that
"Congress shall make no law . . . prohibiting the free

exercise [of religion]." U.S. Const. amend. I. Depending on the nature of the challenged law or government action, a free exercise claim can prompt either strict scrutiny or rational basis review.24

If a law is "neutral" and "generally applicable," and burdens religious conduct only incidentally, the Free Exercise Clause offers no protection. Employment Div. v. Smith, 494 U.S. 872, 879 (1990).25  Smith held that the Free Exercise Clause did not require a state to exempt the ingestion of peyote during a Native American Church ceremony from its neutral, generally applicable prohibition on using that drug. Id. at 882. On the other hand, if the law is not neutral (i.e., if it discriminates against religiously motivated conduct) or is not generally applicable (i.e., if it proscribes particular conduct only or primarily when religiously motivated), strict scrutiny applies and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest.26Church of the Lukumi

_____

24. To survive strict scrutiny, a challenged government action must be narrowly tailored to advance a compelling government interest, whereas rational basis review requires merely that the action be rationally related to a legitimate government objective. As explained below, an intermediate level of scrutiny may apply in the public employment context.

25. Smith involved a criminal law, but its rule also applies in the context of non-criminal laws and regulations. See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993); Fraternal Order of Police v. City of Newark, 170 F.3d 359, 363-64 (3d Cir. 1999).

26. Strict scrutiny may also apply when a neutral, generally applicable law incidentally burdens rights protected by "the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, or the rights of parents . . . to direct the education of their children," Smith, 494 U.S. at 881 (citations omitted), but the plaintiffs do not assert such a "hybrid rights" claim.

26

Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532, 542 (1993).

Further, the Free Exercise Clause's mandate of neutrality toward religion prohibits government from "deciding that secular motivations are more important than religious motivations." Fraternal Order of Police v. City of Newark, 170 F.3d 359, 365 (3d Cir. 1999). Accordingly, in situations where government officials exercise discretion in applying a facially neutral law, so that whether they enforce the law depends on their evaluation of the reasons underlying a violator's conduct, they contravene the neutrality requirement if they exempt some secularly motivated conduct but not comparable religiously motivated conduct. See Lukumi, 508 U.S. at 537; Smith, 494 U.S. at 884; Bowen v. Roy, 476 U.S. 693, 708 (1986) (plurality opinion); Fraternal Order of Police, 170 F.3d at 364-65. Thus in

Lukumi the Supreme Court invalidated an ordinance "punishing '[w]hoever . . . unnecessarily . . . kills any animal,' " where state and local officials interpreted the ordinance to ban animal sacrifices during Santeria religious ceremonies, but to exempt secular activities such as hunting, slaughtering animals for food, and even using live rabbits to train greyhounds. 508 U.S. at 537 (alteration in original). The officials' selective application of the ordinance "devalue[d] religious reasons for killing by judging them to be of lesser import than nonreligious reasons," causing religiously motivated conduct to be "singled out for discriminatory treatment." Id. at 537-38. Therefore, strict scrutiny applied, and the ordinance failed that test because its "proffered objectives [were] not pursued with respect to analogous non-religious conduct." Id. at 546.

Because the ordinance in Lukumi gave officials discretion to consider "the particular justification" for each violation, it "represent[ed] a system of 'individualized governmental assessment of the reasons for the relevant conduct,' " triggering under Smith strict scrutiny of the ordinance's application to religiously motivated conduct. Id. at 537 (quoting Smith, 494 U.S. at 884). In Fraternal Order of Police, we held that the neutrality principle applies with equal force when government creates categorical, as opposed to individualized, exceptions for secularly

motivated conduct. 170 F.3d at 365. A city's police department applied its no-beard policy, which was designed to promote uniform appearance, to allow medical exemptions but deny similar exemptions to two Sunni Muslim officers whose faith required them to grow beards. Id. at 360-61, 366. Selective enforcement of this nature, we said, exemplified the Supreme Court's concern in Smith and Lukumi about "the prospect of the government's deciding that secular motivations are more important than religious motivations." Id. at 365. It showed that the police department "made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." Id. at 366. Therefore, the enforcement of the policy against the Sunni Muslim officers was "sufficiently suggestive of discriminatory intent . . . to trigger heightened scrutiny under Smith and Lukumi."[27]

---

27. Smith and Lukumi state unambiguously that strict scrutiny applies when government discriminates against religiously motivated conduct. See Smith, 494 U.S. at 884; Lukumi, 508 U.S. at 546. However, our decision in Fraternal Order of Police applied only "heightened" or "intermediate" scrutiny, under which the challenged government action must be substantially related (rather than narrowly tailored) to promoting an important (rather than compelling) government interest. We did so because First Amendment rights are limited in the public employment context by a government's need to function efficiently. See, e.g., United States v. Nat'l Employees Treasury Union, 513 U.S. 454, 465 (1995); Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). In any event,

we determined that the police department's discriminatory value judgment failed even intermediate scrutiny. Fraternal Order of Police, 170 F.3d at 365-66 & n.7.

We note that, in contrast to our decision in Fraternal Order of Police, two other circuit courts have stated that the Free Exercise Clause offers no protection when a statute or policy contains broad, objectively defined exceptions not entailing subjective, individualized consideration. See Swanson v. Guthrie v. Indep. Sch. Dist. No. I-L, 135 F.3d 694, 701 (10th Cir. 1998) (stating that school district's excepting fifth-year seniors and special education students from "no-part-time-attendance" policy did not require strict scrutiny of refusal to allow Christian home-schooled student to attend part-time); Am. Friends Serv. Comm. v. Thornburgh, 951 F.2d 957, 961 (9th Cir. 1991) (determining that exceptions in statute regulating immigrant hiring for independent contractors, household employees, and employees hired before November 1986 did not trigger strict scrutiny of denial of religiously motivated exemption request because the statutory exceptions "exclude entire, objectively-defined categories of employees from the scope of the statute").

Id. at 365. The Sunni Muslim officers' beards posed no greater threat to uniform appearance than did the beards worn by officers with medical conditions. Id.  at 366. Thus the police department's policy was void under "any degree of heightened scrutiny." Id. at 367.

Smith, Lukumi, and Fraternal Order of Police point the way to the appropriate level of scrutiny in this case. On its face, Ordinance 691 is neutral and generally applicable. But "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded [from constitutional attack] by mere compliance with the requirement of facial neutrality." Lukumi, 508 U.S. at 534. We must look beyond the text of the ordinance and examine whether the Borough enforces it on a religion-neutral basis, as "the effect of a law in its real operation is strong evidence of its object." Id. at 535.

Because Ordinance 691 is neutral and generally applicable on its face, if the Borough had enforced it uniformly, Smith would control and the plaintiffs' claim would accordingly fail. The Borough insists it has done so, but the record shows otherwise. Indeed, the Borough has tacitly or expressly granted exemptions from the ordinance's unyielding language for various secular and religious--though never Orthodox Jewish--purposes. Cf. Fowler v. Rhode Island, 345 U.S. 67, 69 (1953) (holding that city violated Free Exercise Clause by enforcing ordinance banning meetings in park against Jehovah's Witnesses but exempting other religious groups).

From the drab house numbers and lost animal signs to the more obtrusive holiday displays, church directional signs, and orange ribbons--the last of which the District Court erroneously deemed irrelevant to the constitutional analysis28--the Borough has allowed private citizens to affix

28. Pursuant to our "constitutional duty to conduct an independent examination of the record as a whole," Hurley , 515 U.S. at 567, we believe there is ample evidence in the record showing that orange ribbons were attached to the Borough's utility poles for "a lengthy period of time" and that Borough officials knew about them but made no effort to remove them. A594-95 (Mayor Moscovitz Test.); see also A277 (statement of Tenafly resident Lee Rosenbaum that"[s]urely, a town that brandished orange ribbons tied to almost every pole in town for what I think was several years can tolerate some unobtrusive markers").

various materials to its utility poles. Apart from their religious nature, the lechis are comparable to the postings the Borough has left in place. If anything, the lechis are less of a problem because they are so unobtrusive; even observant Jews are often unable to distinguish them from ordinary utility wires. While the Borough alleges that the lechis are different because the plaintiffs intend them to be "permanent," house numbers nailed to utility poles are likewise intended to be permanent. And although the Borough insists that the lechis' religious nature justifies its decision to remove them, this is precisely the sort of reasoning that Lukumi and Fraternal Order of Police forbid.

We believe that the Borough's selective, discretionary application of Ordinance 691 against the lechis  violates the neutrality principle of Lukumi and Fraternal Order of Police because it "devalues" Orthodox Jewish reasons for posting items on utility poles by "judging them to be of lesser import than nonreligious reasons," and thus "single[s] out" the plaintiffs' religiously motivated conduct for discriminatory treatment. Lukumi, 508 U.S. at 537; Fraternal Order of Police, 170 F.3d at 364-65. 29 Just as the exemptions for secularly motivated killings in Lukumi indicated that the city was discriminating against Santeria animal sacrifice, and just as the medical exemption in Fraternal Order of Police indicated that the police department was discriminating against religiously motivated requests to grow beards, the Borough's invocation of the often-dormant Ordinance 691 against conduct motivated by Orthodox Jewish beliefs is "sufficiently suggestive of discriminatory intent," Fraternal Order of Police, 170 F.3d at 365, that we must apply strict scrutiny. See Lukumi, 508 U.S. at 546.30

---

29. We note, however, that we reject the plaintiffs' contention that the Free Exercise Clause bars the Borough from distinguishing between the lechis and the plastic-covered wires attached to utility poles by telephone and cable television companies. Because utility poles exist to facilitate telecommunications, utility wires are obviously unlike any of the other materials the Borough has allowed people to affix to the poles.

30. Whereas First Amendment rights are necessarily limited in the public employment context, see Nat'l Employees Treasury Union, 513 U.S. at

The Borough nonetheless contends that three aspects of this case--the plaintiffs' use of government property, the lack of a "substantial burden" on the plaintiffs' religious freedom, and the "optional" nature of the eruv--place it outside the framework of Lukumi and Fraternal Order of Police, and thus preclude us from applying strict scrutiny even though the Borough has discriminated against conduct motivated by Orthodox Jewish beliefs.

First, the Borough insists that, because the utility poles are on its land, this case is governed by Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439 (1988), which held that the Free Exercise Clause did not prevent the federal government from implementing a decision, based on religion-neutral criteria, to construct a road and allow timber harvesting on 17,000 acres of national forest land traditionally used by Native Americans for religious practices. Id. at 447-53; see also Bowen v. Roy, 476 U.S. 693, 699-701, 708 (1986) (holding that Free Exercise Clause did not require government to grant religious exemption from generally applicable, religion-neutral statutory requirement that welfare recipients furnish their Social Security numbers where no individualized exemptions were allowed). According to the Borough, the controlling principle is that "'the Free Exercise Clause is

_____

465, our case, unlike Fraternal Order of Police , involves purely private conduct. Thus Smith and Lukumi obligate us to apply strict scrutiny. See supra note 27.

We note that, in determining the appropriate standard to apply, we do not believe it necessary to consider the subjective motivations of the Council members who voted to remove the eruv. Lukumi and Fraternal Order of Police inferred discriminatory purpose from the objective effects of the selective exemptions at issue without examining the responsible officials' motives. See Lukumi, 508 U.S. at 537-38; Fraternal Order of Police, 170 F.3d at 364-66; see also Laurence H. Tribe, American Constitutional Law S 5-16, at 956 (3d ed. 2000) ("Under Smith, a law that is not neutral or that is not generally applicable can violate the Free Exercise Clause without regard to the motives of those who enacted the measure."). Likewise, the objective effects of the Borough's enforcement of Ordinance 691 are sufficient for us to conclude that it is not being applied neutrally against the eruv.

31

written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government."' Northwest Indian Cemetery, 485 U.S. at 451 (1988) (quoting Sherbert, 374 U.S. at 412 (Douglas, J., concurring)); Roy, 476 U.S. at 700.

Contrary to the Borough's position, however, the principle of Lukumi and Fraternal Order of Police--that government cannot discriminate between religiously motivated conduct and comparable secularly motivated

conduct in a manner that devalues religious reasons for acting--applies not only when a coercive law or regulation prohibits religious conduct, but also when government denies religious adherents access to publicly available money or property. See Sherbert v. Verner, 374 U.S. 398, 404-05 (1963) (holding that Free Exercise Clause prohibits state from devaluing religious reasons for seeking unemployment benefits); Davey v. Locke, 299 F.3d 748, 753-54 (9th Cir. 2002) (holding that Free Exercise Clause bars state from making college scholarships contingent on recipients not majoring in theology); cf. Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. at 831-35 (holding that Free Speech Clause precludes state university that pays student publications' printing costs from denying funding based on publication's religious viewpoint).

In contrast, the principle of Northwest Indian Cemetery applies only when a person of faith asks for special, not equal, treatment in the context of a religion-neutral policy. See Adams v. Comm'r of Internal Revenue, 170 F.3d 173, 181 & n.10 (3d Cir. 1999) (rejecting argument that "uniform and facially neutral" penalty for"a conscious, intentional failure" to file taxes could not be applied to religious objector); Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 701-02 (10th Cir. 1998) (rejecting claim that school district must grant religiously motivated request for individualized exemption from no-part-time-attendance policy where no individualized exemptions were granted). It does not apply when government discriminates against religiously motivated conduct in allocating "the rights, benefits, and privileges enjoyed by other citizens." Northwest Indian Cemetery, 485 U.S. at 449.

32

In this case, the plaintiffs are not asking for preferential treatment. Instead, they ask only that the Borough not invoke an ordinance from which others are effectively exempt to deny plaintiffs access to its utility poles simply because they want to use the poles for a religious purpose. Cf. Widmar v. Vincent, 454 U.S. 263, 273 n.13 (1981) ("This case is different from the cases in which religious groups claim that the denial of facilities not available to other groups deprives them of their rights under the Free Exercise Clause.") (emphasis in original); Davey, 299 F.3d at 757-58 ("This is not a case where a person claims that denial of a financial benefit which is not available to others deprives him of his free exercise rights."). Therefore, Lukumi and Fraternal Order of Police, not Northwest Indian Cemetary, control our disposition.

Second, the Borough maintains that strict scrutiny should not apply because the plaintiffs have not shown that the removal of the eruv would substantially burden their religious practice. Under Smith and Lukumi, however, there is no substantial burden requirement when government discriminates against religious conduct. See Lukumi, 508 U.S. at 531-47 (finding Free Exercise Clause violation without considering whether a substantial burden on

religious freedom existed); Fraternal Order of Police, 170 F.3d at 364-67 (same); Brown v. Borough of Mahaffey, 35 F.3d 846, 849-50 (3d Cir. 1994) ("Applying such a burden test to non-neutral government actions would make petty harassment of religious institutions and exercise immune from the protection of the First Amendment."). Instead, the plaintiffs need to show only "a sufficient interest in the case to meet the normal requirement of constitutional standing," Hartmann v. Stone, 68 F.3d 973, 979 n.4 (6th Cir. 1995) (rejecting substantial burden requirement), and their inability to attend synagogue on the Sabbath without the eruv easily suffices.

Moreover, Smith admonished courts not to engage in the sort of inquiry the Borough demands. The Supreme Court explained that "[j]udging the centrality of different religious practices" violates the principle that "courts must not presume to determine the place of a particular belief in a religion." Smith, 494 U.S. at 887; see also DeHart v. Horn,

227 F.3d 47, 56 (3d Cir. 2000) (en banc) (same). Evaluating the extent of a burden on religious practice is equally impermissible, the Smith Court said, because it entails a forbidden inquiry into religious doctrine. "'Constitutionally significant burden' would seem to be 'centrality' under another name," and "inquiry into 'severe impact' is no different from inquiry into centrality."[31] Smith, 494 U.S. at 887 n.4; see also Northwest Indian Cemetery, 485 U.S. at

---

31. Notwithstanding the Supreme Court's admonition in Smith against judicial inquiries into the centrality of religious practices, a number of circuit courts persist in imposing a substantial burden requirement in various contexts. See, e.g., Levitan v. Ashcroft, 281 F.3d 1313, 1320 (D.C. Cir. 2002) (stating in prison context that free exercise plaintiff must demonstrate that the challenged law burdens "a central tenet or important practice of [his] religion"); Am. Family Ass'n, Inc. v. City and County of San Francisco, 277 F.3d 1114, 1124 (9th Cir. 2002) (noting that Ninth Circuit continues to demand that a plaintiff show substantial burden in challenges to government actions that are not "regulatory, proscriptive or compulsory," though the more recent decision in Davey v. Locke, discussed above, did not impose this requirement); Altman v. Minn. Dep't of Corrections, 251 F.3d 1199, 1204 (8th Cir. 2001) ("Government significantly burdens the exercise of religion if it significantly constrains conduct or expression that manifests a central tenet of a person's religious beliefs, meaningfully curtails the ability to express adherence to a particular faith, or denies reasonable opportunities to engage in fundamental religious activities."); Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 79 (2d Cir. 2001) (stating, contrary to Smith and Lukumi and without citing either opinion, that substantial burden test applies when neutral law incidentally impinges on religious exercise); Strout v. Albanese, 178 F.3d 57, 65 (1st Cir. 1999) (quoting a pre-Smith case for the proposition that "the free exercise inquiry [is] whether government has placed a substantial burden on the observation of a central belief or practice") (internal quotation marks omitted) (emphasis in original); United States v. Grant , 117 F.3d 788, 793 (5th Cir. 1997) (rejecting free exercise claim, without citing Smith or Lukumi,

on ground that plaintiff's religious freedom was not substantially burdened); Goodall by Goodall v. Stafford County Sch. Bd., 60 F.3d 168, 173 (4th Cir. 1995) (stating that substantial burden requirement applies when challenged law is not generally applicable); Fleischfresser v. Dirs. of Sch. Dist. 200, 15 F.3d 680, 689-90 (7th Cir. 1994) (requiring substantial burden as prerequisite for free exercise claim without citing Smith); Church of Scientology v. City of Clearwater, 2 F.3d 1514, 1549 (11th Cir. 1993) (stating that strict scrutiny applies when a law that targets religion imposes a substantial burden on believers).

34

451 ("Whatever may be the exact line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs, the location of the line cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development."); cf. Widmar, 454 U.S. at 269 n.6 (rejecting distinction between "religious worship" and other religious speech because it would require courts"to inquire into the significance of words and practices to different religious faiths" and "[s]uch inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases").

Third, the Borough asserts that the plaintiffs cannot state a free exercise claim because the eruv is an "optional" religious practice. For reasons similar to those counseling against requiring the plaintiffs to demonstrate a substantial burden on their religious practice, we cannot accept the Borough's contention that courts presented with free exercise claims should, as a threshold matter, determine whether the religious practices at issue are "mandatory" or "optional." We need not consider whether the Borough's characterization of the eruv is accurate. Neither the Supreme Court nor our Court has intimated that only compulsory religious practices fall within the ambit of the Free Exercise Clause. To the contrary, our en banc decision in DeHart said that conduct implicates the Free Exercise Clause if it is motivated by "beliefs which are both sincerely held and religious in nature" without regard to whether it is mandatory. 227 F.3d at 51; cf. id. at 54-55 (rejecting contention that, in the context of prisoners' free exercise claims, conduct based on "religious commandments" should receive more protection than conduct that is"a positive expression of belief"); see also Levitan v. Ashcroft, 281 F.3d 1313, 1319 (D.C. Cir. 2002) (holding that, because "[a] requirement that a religious practice be mandatory to warrant First Amendment protection finds no warrant in the cases of the Supreme Court or of this court," Catholic prisoners could raise free exercise challenge to rule barring them from consuming small amounts of wine during Communion).32 Further, if the Borough's position

---

32. But see Ward v. Walsh, 1 F.3d 873, 878 (9th Cir. 1993) (suggesting, without citing supporting legal authority, that there is a "distinction

35

were correct, the Lukumi Court would have considered whether Santeria adherents believe their faith commands them to sacrifice animals. But the Court did not do so, instead deeming it sufficient that they had a sincere desire to sacrifice animals for religious reasons. See Lukumi, 508 U.S. at 531.

Additionally, if anything turned on whether a religious practice is "mandatory" or "optional," courts would have to question "the validity of particular litigants' interpretations of [their] creeds" and perhaps even adjudicate "controversies over religious authority or dogma," tasks that are "not within the judicial ken." Smith , 494 U.S. at 877, 887 (internal quotation marks omitted); cf. Presbyterian Church in U.S. v. Mary Elizabeth Hull Mem'l Presbyterian Church, 393 U.S. 440, 449-50 (1969) (holding that the Free Exercise Clause prohibits courts from deciding church property disputes by resolving underlying conflicts over "the interpretation of particular church doctrines and the importance of those doctrines to the religion"); see also United States v. Ballard, 322 U.S. 78, 84-88 (1944) (holding that courts can inquire into the sincerity, but not the truth or falsity, of religious beliefs).

Finally, if the First Amendment shielded only compulsory religious practices, religions without commandments "would find themselves outside the scope of First Amendment protection altogether," Levitan, 281 F.3d at 1320, a result antithetical to basic Free Exercise Clause norms. See, e.g., Fowler, 345 U.S. at 70 ("[I]t is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment.").

As the Borough's arguments for eschewing strict scrutiny are unpersuasive, we must consider whether its invocation of Ordinance 691 against the lechis is likely to pass that test.

---

between a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his soul" in the context of prisoners' free exercise claims).

36

2. Application of strict scrutiny

Because the Borough's decision to remove the eruv is not neutral toward conduct motivated by Orthodox Jewish beliefs, it "must undergo the most rigorous of scrutiny." Lukumi, 508 U.S. at 546. To be permissible under the Free Exercise Clause, it "must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." Id. (internal quotation marks omitted). The Borough attempts to justify its decision to remove the eruv, and distinguish the lechis from the violations of Ordinance

691 it has tolerated, on the grounds that the lechis are "permanent" and religious in nature. Neither ground is persuasive.

Much of our strict scrutiny analysis parallels our earlier discussion of why the Borough's decision is not religion-neutral. See Lukumi, 508 U.S. at 546-47 (stating that lack of neutrality eviscerates contention that restriction is narrowly tailored to advance compelling interest). First, for many years--and, the record shows, after the plaintiffs sued--the Borough has allowed its residents to nail house numbers to utility poles. Because the Borough has tolerated equally permanent house numbers, it hardly has a compelling interest in refusing to allow the inconspicuous lechis on the ground that they are permanent. Further, it is hard to see how the allegedly permanent nature of the unobtrusive lechis somehow undermines Ordinance 691's objective of avoiding visual clutter and maintaining control over municipal property more than items like bright orange ribbons and lost animal signs. Moreover, even if the Borough had a compelling interest in preventing permanent fixtures on its utility poles, its decision to remove the eruv while allowing the house numbers is not narrowly tailored to promote that interest.

Though the Borough's claim that it can remove the eruv because of its religious nature requires more discussion, it is similarly unpersuasive. The Borough maintains that its decision to remove the eruv is justified by its "compelling" interest in avoiding "an Establishment Clause controversy." Contrary to the Borough's position, however, a government interest in imposing greater separation of church and state than the federal Establishment Clause mandates is not

compelling in the First Amendment context. See Widmar, 454 U.S. at 276 (rejecting state university's contention that its interest in complying with the state constitution's prohibition on religious establishments, which was more restrictive than its federal counterpart, justified discriminating against religious speech, and explaining that "the state interest asserted here--in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution --is limited by the Free Exercise Clause and in this case by the Free Speech Clause as well")33 Davey, 299 F.3d at 759 (same in context of free exercise claim).

---

33. In 1990, a divided panel of our Court suggested in dictum--in a case that did not involve a Free Exercise Clause claim, and without citing Widmar--that public schools have "a compelling interest in maintaining the appearance of religious neutrality" in their classrooms, and that this interest, even if not required by the Establishment Clause, might outweigh public employees' free exercise right to wear religious garb. United States v. Board of Education, 911 F.2d 882, 889 (3d Cir. 1990) (holding that Title VII does not require public schools to allow teachers to wear religious garb, as this would impose an"undue hardship" on the

schools under 42 U.S.C. S 2000e(j)). The opinions cited in support of this proposition were Cooper v. Eugene School District, 723 P.2d 298 (Or. 1986)--which also did not cite Widmar--and the Supreme Court's one-sentence order dismissing an appeal from the Oregon Supreme Court's ruling "for want of a substantial federal question." 480 U.S. 942 (1987).

To the extent that the Oregon Supreme Court held in Cooper that concerns about appearing neutral toward religion could outweigh employees' free exercise rights in the public school context, we do not believe the United States Supreme Court's summary disposition approved that reasoning. Instead, we believe, especially in light of subsequent doctrinal developments, that the dictum in United States v. Board of Education may be inconsistent with Widmar's principle that an interest in more separation between church and state than the Establishment Clause requires cannot justify restricting rights shielded by the Free Exercise Clause. See Widmar, 454 U.S. at 276.

First, summary dispositions by the Supreme Court"cannot be taken as adopting the reasoning of the lower court," Wis. Dep't of Revenue v. Wrigley Co., 505 U.S. 214, 224 n.2 (1992); Zobel v. Williams, 457 U.S. 55, 64 n.13 (1982) (same), and they can be used as precedent "only if the [lower court's] decision[ ] rested solely on established constitutional principles and did not break any new ground." Robert L. Stern et al., Supreme Court Practice S 4.29, at 284 (8th ed. 2002). Hence the Supreme

38

The Borough further argues, however, that leaving the eruv in place would constitute an actual Establishment Clause violation, and that the need to avoid such a violation justifies discriminating against the plaintiffs' religiously motivated conduct. Before explaining why this argument is also unavailing, we must examine the Supreme Court's recent pronouncements in the area.34 Until the past

_____

Court's summary disposition in Cooper cannot be interpreted as endorsing the Oregon Supreme Court's reasoning, particularly since that reasoning flatly contradicts Widmar. See Fusari v. Steinberg, 419 U.S. 379, 388-89 n.15 (1975) (stating that, even though a lower court's interpretation of a summary affirmance by the Supreme Court was "plausible," it was improper because it would"leave little vitality" to an earlier Supreme Court decision); see also id.  at 391-92 (Burger, C.J., concurring) ("An unexplicated summary affirmance settles the issues for the parties, and is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument.").

Since Cooper, moreover, the Supreme Court has held in several cases that a government interest in appearing neutral toward religion, where not necessary to comply with the Establishment Clause, cannot justify limiting First Amendment rights. See Good News Club v. Milford Cent. Sch., 533 U.S. 98, 112-19 (2001); Rosenberger, 515 U.S. at 839-46; Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 761-63 (1995); Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 395 (1993). Because subsequent doctrinal developments remove whatever precedential authority a summary disposition inconsistent with them might have, see Hicks v. Miranda, 422 U.S. 332, 344-45 (1975); Lecates v. Justice of Peace Ct. No. 4, 637 F.2d 898, 902 (3d Cir. 1980), we believe that in all likelihood the Supreme Court summarily dismissed

the appeal in Cooper under the principle of Pickering v. Board of Education, 391 U.S. 563 (1968), which held that government can impose restrictions on the First Amendment rights "of public employees that would be plainly unconstitutional if applied to the public at large." United States v. Nat'l Employees Treasury Union, 513 U.S. 454, 465 (1995). Thus the Supreme Court had no need in Cooper to consider whether an interest in appearing neutral toward religion can trump free exercise rights outside the context of public employment.

34. Two courts have held that the Establishment Clause allows a municipality affirmatively to grant Orthodox Jews access to public property so they can create an eruv. See ACLU of N.J. v. City of Long Branch, 670 F. Supp. 1293, 1295-97 (D.N.J. 1987); Smith v. Community Bd. No. 14, 491 N.Y.S.2d 584, 586-87 (N.Y. Sup. Ct. 1985), aff'd, 518 N.Y.S.2d 356, 357 (N.Y. App. Div. 1987). Those cases are not on point here because the Borough has not approved the eruv.

decade, the Supreme Court generally applied the three-prong test of Lemon v. Kurtzman, 403 U.S. 602 (1971), under which government action is consistent with the Establishment Clause if it (1) "has a secular purpose"; (2) "does not have the principal or primary effect of advancing or inhibiting religion"; and (3) "does not foster an excessive entanglement with religion." Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 395 (1993). 35

Recent Supreme Court decisions, however, have not applied the Lemon test. Instead, in cases involving Establishment Clause challenges to private individuals' use of government resources, the Court has applied the endorsement test developed by Justice O'Connor, which dispenses with the "entanglement" prong of the Lemon test and collapses its "purpose" and "effect" prongs into a single inquiry: would a reasonable, informed observer, i.e., one familiar with the history and context of private individuals' access to the public money or property at issue, perceive the challenged government action as endorsing religion?36 See Zelman v. Simmons-Harris, ___ U.S. ___ , ___, 122 S. Ct. 2460, 2468-69 (2002) (upholding school voucher program where 96% of participating students attended religiously affiliated schools because parents' genuine and

---

35. Compare, e.g., Widmar, 454 U.S. at 271-75 (applying Lemon test to hold that Establishment Clause does not bar state university from allowing religious groups to use generally available facilities); Lynch v. Donnelly, 465 U.S. 668, 679-86 (1984) (applying Lemon test to uphold city-sponsored Christmas display that included creche alongside various secular symbols), with Lee v. Weisman, 505 U.S. 577, 586-87 (1992) (invalidating prayer at public school graduation led by clergyman chosen by school officials without relying on Lemon test); Marsh v. Chambers, 463 U.S. 783, 792-95 (1983) (upholding practice of opening state legislative sessions with prayers by state-employed chaplain without mentioning Lemon test); see generally Lamb's Chapel, 508 U.S. at 398-99 (Scalia, J., concurring in the judgment) (chronicling Court's erratic invocation of Lemon test).

36. "Entanglement" still matters, however, in the context of direct aid to public schools, where the Court subsumes it within the "effect" analysis, see Agostini v. Felton, 521 U.S. 203, 232-33 (1997), and in the rare case where government delegates civic power to a religious group. See Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet , 512 U.S. 687, 696-705 (1994); Larkin v. Grendel's Den, Inc., 459 U.S. 116, 126-27 (1982).

independent choices determined where children went to school); Good News Club v. Milford Cent. Sch. , 533 U.S. 98, 117-19 (2001) (holding that Establishment Clause did not require public school to bar evangelical Christian student group from using facilities accessed by various other groups);37 Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 763 (1995) (relying on the endorsement analysis in Lamb's Chapel to hold that Establishment Clause did not require state to prevent private group from erecting cross on statehouse grounds, a traditional public forum)38; Lamb's Chapel, 508 U.S. at 395 (reciting the Lemon test but relying primarily on the endorsement test to hold that the Establishment Clause did not prohibit school district from letting evangelical church group use publicly available school facilities to show film series on Christian family values); see also ACLU of N.J. v. Schundler, 168 F.3d 92, 103, 105-07 (3d Cir. 1999) (noting that Justice O'Connor's endorsement test is the governing standard and applying it to uphold government-sponsored holiday display

_____

37. When presented with Establishment Clause claims in the context of public education, the Supreme Court considers not only whether a reasonable, informed observer would perceive an endorsement of religion, but also whether the challenged government practice coerces students into participating in religious activity. See Good News Club, 533 U.S. at 115-16; Lee, 505 U.S. at 592-93. The Court has not applied its coercion test outside the public education context.

38. Seven Justices in Capitol Square agreed that the reasoning of Lamb's Chapel controlled, Capitol Square, 515 U.S. at 762, three of these seven expressly applied the reasonable, informed observer test, see id. at 772 (O'Connor, J., joined by Souter & Breyer, JJ.), and the two dissenting Justices also applied the endorsement test, see id. at 797-98 (Stevens, J., dissenting); id. at 817-18 (Ginsburg, J., dissenting). Four Justices, however, recognized that the endorsement test controls when government discriminates in favor of religion, but argued that there is no need to apply the test to "purely private" religious expression that occurs in a public forum "open to all on equal terms" because such expression can never violate the Establishment Clause. Id.  at 770 (opinion of Scalia, J.). Notwithstanding the Justices' divergent approaches, subsequent Supreme Court decisions treat the reasonable, informed observer test discussed at length in Justice O'Connor's opinion as representing Capitol Square's holding with respect to the appropriate Establishment Clause test. See Good News Club, 533 U.S. at 119; Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308 (2000).

against Establishment Clause attack). Each of these decisions upheld the challenged government action because it treated religion neutrally, and thus would not be viewed by a reasonable, informed observer as endorsing religion.39

In contrast, government runs afoul of the endorsement test and violates the Establishment Clause when it affirmatively supports religion on preferential terms. See Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 305-10 (2000) (invalidating school policy of encouraging and sponsoring student-initiated, student-led prayers before high school football games because reasonable, informed observer would perceive school as endorsing religion); County of Allegheny v. ACLU, Greater Pittsburgh Chapter, 492 U.S. 573, 598-601 (1989) (holding that county violated Establishment Clause by giving Roman Catholic group preferential access to display stand-alone creche depicting birth of Jesus on main staircase of its seat of government because reasonable observer would believe county's action was meant to support and promote Christianity); see also ACLU of N.J. v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1484-88 (3d Cir. 1996) (en banc) (invalidating scheme that allowed public high school students to choose graduation prayer, but not any secular speech, by plurality vote).40 In addition, some Justices have held out the possibility that, even if government grants equal rather than preferential access to religion, a reasonable, informed observer could perceive an endorsement of religion in

---

39. While the Supreme Court's Establishment Clause jurisprudence consistently emphasizes neutrality toward religion, it allows government to "accommodate religious needs by alleviating special burdens" on religious practice unless the "accommodation" delegates political power to a particular religious group or otherwise "singles out a particular religious sect for special treatment." Kiryas Joel Village Sch. Dist., 512 U.S. at 705-06.

40. The Allegheny Court also held, with no majority opinion on this point, that local officials did not endorse religion by erecting a display including a menorah, a Christmas tree, and a sign entitled "Salute to Liberty" in front of another government building. See 492 U.S. at 613-21 (opinion of Blackmun, J.); id. at 632-36 (O'Connor, J., concurring in part and concurring in the judgment); id. at 663-67 (Kennedy, J., concurring in the judgment in part and dissenting in part).

extraordinary cases. See Capitol Square, 515 U.S. at 777-78 (O'Connor, J., concurring in part and concurring in the judgment). For instance, if one or more religious groups dominated property the government made available to the public, a reasonable observer might perceive an endorsement of religion. See id.; cf. Freedom from Religion Found. v. City of Marshfield, 203 F.3d 487, 489, 494-96 (7th Cir. 2000) (holding that Establishment Clause was violated where sole display in public forum was fifteen-foot-tall white marble statue of Jesus bearing inscription "Christ Guide Us On Our Way" in twelve-inch block letters and

facing oncoming traffic on adjacent highway).

Applying these principles to this case, we believe that, if the Borough ceased discriminating against the plaintiffs' religiously motivated conduct to comply with the Free Exercise Clause, a reasonable, informed observer would not perceive an endorsement of Orthodox Judaism because the Borough's change of heart would "reflect[] nothing more than the governmental obligation of neutrality" toward religion. Sherbert, 374 U.S. at 409. A reasonable observer "must be deemed aware of the history and context of the community," Good News Club, 533 U.S. at 119 (internal quotation marks omitted); see also Zelman, 122 S. Ct. at 2468-69; Black Horse Pike, 84 F.3d at 1486, and "presumed to possess a certain level of information that all citizens might not share." Capitol Square, 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in the judgment); see also Good News Club, 533 U.S. at 118 (stating that reasonable observer would know about non-neutral implementation of policy); ACLU of N.J. v. Schundler, 168 F.3d at 106 (noting that reasonable observer would be aware of city's year-round practices regarding cultural displays and celebrations). Thus the reasonable, informed observer would know that the lechis are items with religious significance and that they enable Orthodox Jews to engage in activities otherwise off limits on the Sabbath, but would also know that the Borough was allowing them to remain on the utility poles only because its selective application of Ordinance 691 renders removing the lechis a free exercise violation. See Allegheny, 492 U.S. at 632 (O'Connor, J., concurring in part and concurring in the judgment) ("In cases involving the lifting of government

43

burdens on the free exercise of religion, a reasonable observer would take into account the values underlying the Free Exercise Clause in assessing whether the challenged practice conveyed a message of endorsement."). Cognizant of the Borough's secular purpose of complying with the Free Exercise Clause, see Mergens, 496 U.S. at 249, and the religion-neutral effect of treating the lechis like other postings, the reasonable observer would not believe that the Borough was promoting Orthodox Judaism. See Gregoire v. Centennial Sch. Dist., 907 F.2d 1366, 1380 (3d Cir. 1990) (concluding that religion-neutral treatment of Christian group seeking access to public school facilities sent message of neutrality toward, not endorsement of, religion). This is true a fortiori because there is no evidence in the current record that the unobtrusive lechis are intended to send a religious message to anyone.

Further, there is a vital difference between purely private religiously motivated conduct and conduct initiated or sponsored by government. See Rosenberger, 515 U.S. at 841. No reasonable, informed observer would perceive the decision of the plaintiffs to affix lechis to utility poles owned by Verizon and to do so with Cablevision's assistance as " 'a choice attributable to the State.' " Santa Fe Indep., 530 U.S.

at 311 (quoting Lee, 505 U.S. at 587). Similarly, because the eruv is maintained solely with private funds, and because allowing the lechis to remain in place would represent neutral rather than preferential treatment of religiously motivated conduct, no reasonable, informed observer would believe the Borough is "affirmatively sponsor[ing]" an Orthodox Jewish practice. Santa Fe Indep., 530 U.S. at 313.

To the extent that access to the utility poles on Borough land constitutes a "benefit," "the 'guarantee of neutrality is respected, not offended"' when religious persons benefit incidentally from "'neutral criteria and evenhanded policies."' Good News Club, 533 U.S. at 114 (quoting Rosenberger, 515 U.S. at 839). In this context, there is "no realistic danger" that, if the Borough treated the plaintiffs' religiously motivated conduct on religion-neutral terms, reasonable, informed observers would perceive an endorsement of Orthodox Judaism. Lamb's Chapel , 508

44

U.S. at 395. Moreover, even if there is some slight risk that a reasonable, informed observer might "misperceive the endorsement of religion," there is a much greater risk that the observer would perceive hostility toward Orthodox Jews if the Borough removes the lechis. Good News Club, 533 U.S. at 118; Mergens, 496 U.S. at 248; see also Rosenberger, 515 U.S. at 846 (O'Connor, J., concurring) ("Withholding access would leave an impermissible perception that religious activities are disfavored.").41

Because the Free Exercise Clause requires neutral treatment of religion, see Smith, 494 U.S. at 879, only in a most unusual case could compliance with free exercise norms offend the Establishment Clause. Cf. Kiryas Joel Village Sch. Dist., 512 U.S. at 717 (O'Connor, J., concurring) ("The Religion Clauses prohibit the government from favoring religion, but they provide no warrant for discriminating against religion.") (emphasis in original). This is not such a case. Therefore, the Borough has no Establishment Clause justification for discriminating against the plaintiffs' religiously motivated conduct. Accordingly, the plaintiffs are reasonably likely to prevail on their free exercise claim.

3. Requirements for preliminary injunctive relief

Where a district court has denied a motion for a preliminary injunction, we may order the injunction to issue if "the four factors required to grant a preliminary injunction are apparent on the record before us." Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc., 222 F.3d 132, 140 (3d Cir. 2000); see also Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 883-84 (3d Cir. 1997); Polaroid Corp. v. Disney, 862 F.2d 987, 1006 (3d Cir. 1988).

_____

41. To the extent that the Lemon test retains some trace of vitality, see

Black Horse Pike, 84 F.3d at 1484, even after Zelman, Good News Club, and Santa Fe eschewed it in favor of the endorsement test, it does not support the Borough's Establishment Clause defense. Allowing the eruv to remain in place serves the secular purpose of complying with the Free Exercise Clause, does not have the effect of advancing religion because no reasonable, informed observer would perceive an endorsement of religion, and involves no government entanglement with religion because the Borough will not monitor or support the maintenance of the eruv.

Our review of the record leaves us convinced that, in addition to the reasonable probability that the plaintiffs will ultimately prevail on their free exercise claim, the remaining three factors for injunctive relief--irreparable injury, the balance of hardships, and the public interest-- also favor a preliminary injunction. Limitations on the free exercise of religion inflict irreparable injury. Fifth Ave. Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002); Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001); see also Swartzwelder v. McNeilly, 297 F.3d 228, 241 (3d Cir. 2002) ("'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."') (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)). The plaintiffs have demonstrated that, if the eruv is removed, they will be unable to push and carry objects outside the home on the Sabbath, and those who are disabled or have small children consequently will be unable to attend synagogue. This showing easily satisfies the irreparable injury requirement.

With respect to the balance of hardships, a preliminary injunction would not harm the Borough more than denying relief would harm the plaintiffs. Enjoining removal of the eruv would cause neither the Borough nor its residents any serious injury. Without an injunction, on the other hand, the plaintiffs' free exercise of religion will be impaired. The balance easily tips in the plaintiffs' favor.

Finally, where there are no societal benefits justifying a burden on religious freedom, "the public interest clearly favors the protection of constitutional rights." Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 884 (3d Cir. 1997). We do not see how removing the lechis could advance any interests sufficient to outweigh the infringement of the plaintiffs' free exercise rights.

In this context, the District Court should have preliminarily enjoined the Borough from removing the lechis pending a trial.

IV. Conclusion

Though the plaintiffs are not likely to prevail on their Fair Housing Act claim and do not present a viable free speech

claim, they are reasonably likely to show that the Borough violated the Free Exercise Clause by applying Ordinance 691 selectively against conduct motivated by Orthodox Jewish beliefs. Because the three other factors for injunctive relief also favor the plaintiffs, we reverse the District Court's denial of injunctive relief and will enter an order directing the Court to issue a preliminary injunction barring the Borough from removing the lechis.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

47