**Steven I. BEILOWITZ d/b/a Stevens Beil, a sole proprietorship, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**Civil Action No. 02–3870.**

United States District Court, D. New Jersey.

Dec. 3, 2002.

Howard Langer, Esq., John J. Grogan, Esq., Sandals & Langer, LLP, Don P. Foster, Esq., Michael G. Petrone, Esq., Jeffrey A. Carr, Esq., Pepper Hamilton LLP, Philadelphia, PA, for plaintiff.

Stephen M. Payerle, Esq., Michael S. Waters, Esq., Lois H. Goodman, Esq., Carpenter, Bennett & Morrissey, Newark, NJ, for defendant.

### OPINION

ORLOFSKY, District Judge.

Thomas Hobson, an English liveryman who lived in the seventeenth century, re-

quired his customers to take the horse nearest to the stable door or none at all.[1] Accordingly, a "Hobson's choice" refers to an apparently free choice that offers no real alternative.[2] Here, the Defendant franchisor, General Motors Corporation ("GM"), offered the Plaintiff franchisee, Steven Beilowitz ("Beilowitz"), a Hobson's choice—either to accede to GM's new business plan, which would result in the loss of forty percent of Beilowitz's revenue, or, after a twenty-three-year-long relationship with GM, to be cut out of doing any business with GM at all. This case illustrates the very reason the New Jersey Franchise Practices Act ("NJFPA"), N.J.S.A. §§ 56:10–1, *et seq.*, was enacted—to protect franchisees, possessed of less bargaining power than their franchisors, from such daunting "choices." Thus, for the reasons set forth below, I shall grant Beilowitz's application for a preliminary injunction from the strictures of GM's new business plan.

## I. PROCEDURAL HISTORY

Earlier in this action, GM filed a motion to disqualify the law firm of Pepper Hamilton from representing Beilowitz, which this Court denied. *See Beilowitz v. General Motors Corp.*, 226 F.Supp.2d 565 (D.N.J. 2002). The parties conducted expedited discovery, comprehensively briefed the issues presented, and this Court heard lengthy oral arguments on Beilowitz's application for preliminary injunctive relief at a November 22, 2002 order-to-show-cause hearing.

This Court has jurisdiction over this action based on the diverse citizenship of the parties and the requisite amount in controversy, pursuant to 28 U.S.C. § 1332 (2002).

## II. FINDINGS OF FACT[3]

### A. THE PARTIES

1. Beilowitz is the owner and Chief Executive Officer of Stevens Beil, Sibco Distributors and Genuine Car Parts in Pennsauken, New Jersey (hereafter, "Stevens Beil"). *See* Decl. of Steven I. Beilowitz, 8/7/02 ("Beilowitz Decl."), ¶ 1.

2. GM, founded in 1908, is the world's largest vehicle manufacturer with manufacturing operations in more than thirty countries and sales in about 200 countries. *See* GM Company Profile, *available at* <http://www.gm.com/company/corp—info/profiles> (last visited Nov. 26, 2002).

3. Stevens Beil is a major distributor of multiple lines of General Motors' AC Delco brand auto parts, and sales of AC Delco auto parts comprise over ninety-seven percent of its business. Beilowitz Decl. ¶¶ 2–3, 6.

4. For over twenty-three years, Stevens Beil has been an authorized distributor of AC Delco parts, Beilowitz Decl. ¶ 4, and sells to a variety of customers, including car dealerships, gas stations, fleet accounts, and jobbers, which are smaller sub-distributors who in turn resell products to gas stations and automotive repair centers, *id.* ¶ 5.

---

**1.** *See* Dictionary.com, *available at* <http://dictionary. reference.com> (last visited Nov. 27, 2002); Merriam–Webster's Collegiate Dictionary, *available at* <http://www.m-w.com> (last visited Nov. 27, 2002). Another notable example of a Hobson's choice was Henry Ford's offer to customers of the Model T in a choice of "any color so long as it is black." Dictionary.com, *supra, at* <http://dictionary. reference.com/wordoftheday/archive/ 2000/01 /31.html> (last visited Nov. 27, 2002).

**2.** *See id.*

**3.** "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon." Fed.R.Civ.P. 52(a) (West 2002).

5. Many long-term clients of Stevens Beil equate the Stevens Beil name with AC Delco parts. *See* Supp'l Decl. of Counsel Containing Additional Hearing Exs., 11/20/02 ("Supp'l Counsel Decl."), Ex. B.

## B. BUSINESS RELATIONSHIP BETWEEN STEVENS BEIL AND GENERAL MOTORS

6. Throughout the twenty-three years in which Stevens Beil has been an authorized AC Delco distributor, GM has imposed no geographic restrictions on where Stevens Beil could sell its auto parts. Beilowitz Decl. ¶ 15.

7. In 2001, Stevens Beil sold AC Delco auto parts in at least eleven states and the District of Columbia. Beilowitz Decl. ¶ 13; Decl. of Howard I. Langer, 10/4/02 ("Langer Decl."), Exs. F & G. Its current customer base extends throughout the Eastern Coast of the United States and is concentrated in areas between Virginia and Massachusetts. Beilowitz Decl. ¶ 25.

8. Stevens Beil has a large inventory of over 28,000 AC Delco part numbers, including parts that other AC Delco distributors do not normally keep in stock. Beilowitz Decl. ¶ 9. The current value of Stevens Beil's AC Delco inventory is $4.5 million. *Id.* ¶ 11. This large inventory is advantageous to Stevens Beil because competition among authorized AC Delco distributors hinges on inventory, as well as on efficient service, competitive pricing, and business goodwill. *Id.* ¶ 8.

9. Stevens Beil has invested more than $500,000 in a customized computer system designed to price and monitor the inventory of its AC Delco parts. Beilowitz Decl. ¶ 21.

10. The Stevens Beil operation has been successful for itself and GM. From

1990 to 2001, the company's overall sales volume increased from $8.4 million to $27.5 million. *See* Beilowitz Decl. ¶ 10. From 2000 to 2001, sales increased from $24.2 million to $27.5 million. *Id.* ¶ 10; Langer Decl., Ex. E. Of these 2001 sales, $10.7 million were made in New Jersey. Beilowitz Decl. ¶ 14.

11. Beilowitz received two awards from GM for his "tremendous" sales performance, earning him a year's use of a luxury car and a trip to Switzerland. *See* App. of Exs. to Pl.'s Supp'l Mem. in Supp. of Mot. for Prelim. Inj. ("App. of Pl.'s Exs."), Exs. 51–52.

12. For the past twenty-three years, the relationship between Stevens Beil and GM has been governed by a series of contracts that have been in substantially the same form. Beilowitz Decl. ¶¶ 12, 17. The first of these contracts was entered on March 28, 1979. *See* Supplemental Decl. of Steven Beilowitz in Supp. of Application for Prelim. Inj., 10/4/02 ("Supp'l Beilowitz Decl."), Ex. O.

13. The most recent "AC Delco Direct Supply Account Agreement" was in effect for a period of two years from the date of entry, May 25, 1999. *See* Beilowitz Decl., Ex. A, § 11. This agreement required Stevens Beil to:

(a) advertise the AC Delco trademark, *see* Beilowitz Decl. ¶ 17(a), Ex. A, §§ 2B & 2G(3);

(b) participate in national promotional programs sponsored by GM, *see id.* ¶ 17(b), Ex. A, § 2G(4);

(c) maintain AC Delco signage at its place of business in New Jersey, *see id.* ¶ 17(c), Ex. A, § 2D;

(d) place the AC Delco trademark on all of its vehicles,[4] *see id.* ¶ 17(d), Ex. A § 2D;

---

**4.** Stevens Beil has twenty-nine vehicles. *See*   Beilowitz Decl. ¶¶ 11, 31; Langer Decl., Ex.

(e) maintain sufficient staff to promote the sale of AC Delco products,[5] *see id.* ¶ 19(c), Ex. A, § 2G(1); and

(f) hold promotions and special contests to increase customer awareness of AC Delco products, *see id.* ¶ 19(e), Ex. A, § 2G(4).

14. The AC Delco contract also required Stevens Beil to maintain and staff a "will call" counter at its Pennsauken facility to serve "secondary customers." Beilowitz Decl., Ex. A, § 2D(3).

15. GM required Stevens Beil to submit all of its advertising copy to GM for prior approval. Beilowitz Decl. ¶ 18.

## C. PROMOTION AND SALE OF AC DELCO PRODUCTS BY STEVENS BEIL

16. Stevens Beil has placed the AC Delco trademark on all of its business communications, including its stationery, business cards and invoices. Beilowitz Decl. ¶ 20(a), Ex. E.

17. At Stevens Beil's Pennsauken location, twenty-three sample products of AC Delco product lines are displayed. *See* Supp'l Beilowitz Decl. ¶ 2, Ex. A.

18. Customers who choose to pick up items at the front counter typically call ahead so that the item and invoice are ready for them upon arrival. Supp'l Beilowitz Decl. ¶ 3. Some customers show up without having called ahead of time. *Id.*

19. Stevens Beil has sponsored a number of local events prominently using the AC Delco mark in conjunction with "Stevens Beil," including:

(a) a 1994 automobile race at the Pocono Raceway, *see* Supp'l Beilowitz Decl. ¶ 4, Ex. B;

(b) a 2002 Variety Club Miss America Pageant Float, *see id.* ¶ 5, Ex. C;

(c) an automobile race at the Flemington Motor Speedway in Flemington, New Jersey, *see* Beilowitz Decl., Ex. F; and

(d) a holiday toy drive at The Children's Hospital of Philadelphia, *see id.*, Ex. G.

20. Additionally, Stevens Beil, with AC Delco's sponsorship, has hosted a number of instructional clinics at its Pennsauken facility on topics of automotive maintenance and repair.[6] *See* Beilowitz Decl., Ex. D.

## D. GM'S IMPLEMENTATION OF THE "DDG" PROGRAM

21. On January 23, 2002, GM offered Stevens Beil the new version of the AC Delco Direct Account Supply Agreement, the so-called Dedicated Distribution Agreement ("DDA"), which, for the first time, created the Dedicated Distribution Group ("DDG") Program.[7] *See* Beilowitz Decl. ¶ 24, Ex. B.

22. The DDG Program is part of GM's new overall growth strategy, to take advantage of opportunities in the automobile "aftermarket," or replacement parts, business. *See* Certif. of Stephen F. Payerle in Oppos. to Pl.'s Mot. for Prelim. Inj. 10/31/02 ("Payerle Certif."), Ex. 149.

---

D.

**5.** *Stevens Beil has over fifty employees. See* Beilowitz Decl. ¶¶ 11, 31; Langer Decl., Ex. C.

**6.** A flyer for one of these clinics explained to potential attendees that "AC Delco will be here to answer all your questions on thermal air conditioning. You will also be able to tour our warehouse facility and view our large inventory." Beilowitz Decl., Ex. D

**7.** Beilowitz secretly tape-recorded this meeting with AC Delco representatives. *See* Dep. of Steven I. Beilowitz, 9/11/02 ("Beilowitz Dep."), 14:9 to 17:13.

23. Under the DDG Program, only a select group of distributors known as the Dedicated Distribution Group will have the right to market AC Delco products. *See* Supp'l Beilowitz Decl., Ex. N, p. 18.

24. Under the DDA, Stevens Beil would no longer be permitted to sell AC Delco products throughout the country, but would instead be confined to selling in an assigned "Direct Marketing Area," or "DMA," in the Philadelphia area. *See* Beilowitz Decl. ¶ 25.

25. Stevens Beil would be prohibited from selling to its existing customers located outside of the Philadelphia DMA.[8] *See* Beilowitz Decl. ¶ 25.

26. Within the Philadelphia DMA, two other AC Delco distributors, who are competitors of Stevens Beil, would also be permitted to sell AC Delco products.[9] Beilowitz Decl. ¶ 26; Dep. of David Danna, 9/12/02 ("Danna Dep."), 62:22 to 63:18.

27. Under the DDA, Stevens Beil would be required to open satellite facilities within the DMA at locations to be determined by GM. Beilowitz Decl. ¶ 27.

28. The DDA also requires Stevens Beil to develop a business plan approved by GM to meet sales goals set by GM, Beilowitz Decl. ¶ 28, in addition to submitting periodic sales reports, opening its books to GM for regular inspection, and releasing its customer information to GM, *id.* ¶ 29.

29. According to GM's financial projections, Stevens Beil has the potential to make $35 million under the DDG program in the Philadelphia DMA. Payerle Certif., Ex. 129; Danna Dep. 94:17–21.

30. Thomas Reynolds, the GM Zone Sales Manager who prepared the business plans for Stevens Beil and other AC Delco distributors under the DDG program, predicted that Stevens Beil could make $35 million in sales in 2002 under the DMA. Dep. of Thomas Reynolds, 10/24/02 ("Reynolds Dep."), 143:3–9. It is unclear, however, what the basis for Reynolds' optimistic prediction was. When asked at his deposition if he took into account Stevens Beil's sales outside the Philadelphia DMA in arriving at the $35 million figure, Reynolds testified:

> The way I understood the DDG program is that [Beilowitz] was gonna [sic] sell in an area that he himself said that he wasn't selling a whole lot into, but we never got into the mechanics of the numbers and quite frankly if he threw out a number, I'd look at it as an alleged number and based on the number of vehicles that I believed to be in that marketplace, I believed with his commitment to do the job we could've achieved $35 million within 12 to 18 months.

*Id.* 145:2–14.

31. Notably, Reynolds later testified that, in making his business projections about Stevens Beil's potential performance under the DDG program, he did not even know the boundaries of the Philadelphia DMA, as he "was not privy to the DMAs." Reynolds Dep., 166:10–11.

32. At oral argument, counsel for GM explained "whether or not [Beilowitz] winds up coming out ahead or not with respect to this *quid pro quo* that the DDG and DMA system provides, is something

---

8. The Philadelphia DMA includes the following counties: (in Pennsylvania) Berks, Lehigh, Northampton, Chester, Montgomery, Bucks, Delaware and Philadelphia; (in Delaware) Kent and New Castle; and (in New Jersey) Salem, Cumberland, Cape May, Atlantic, Burlington, Mercer, Camden and Gloucester. *See* Beilowitz Decl., Ex. I.

9. One of Stevens Beil's main competitors in the DDG program, Casco Distributing Company, has already solicited some of Stevens Beil's existing customers within the Philadelphia DMA. *See* Second Supplemental Decl. of Steven Beilowitz, 11/12/02 ("Sec. Supp'l Beilowitz Decl."), Exs. A & C.

that we can't say now. [Beilowitz] can make up his lost sales. If the DDG works he comes out well ahead." Tr. of Oral Argument, 11/22/02, 98:21–25.

## E. IRREPARABLE HARM TO STEVENS BEIL CAUSED BY THE DMA PROGRAM

33. There is conflicting expert testimony as to whether GM's target for Stevens Beil under the DMA program is reasonably attainable. According to GM's expert, James A. Anderson[10], if AC Delco achieves its target of a thirty-four percent market penetration[11], Stevens Beil's revenue opportunity will be "in excess of $45,000,000." *See* Decl. of James A. Anderson, 11/1/02 ("Anderson Decl."), ¶¶ 20, 29–34.

34. Anderson based his projections on three data sources, from The Polk Company, Dun & Bradstreet, and Claritas. *See* Anderson Decl. ¶ 10. In his report, however, Anderson concedes that "[s]ince the automotive aftermarket customers do not report or register their purchases, it is a difficult process to calculate the value of the business available at a low level of geography." *Id.* ¶ 23.

35. According to Beilowitz's expert, Richard Lancioni, GM's performance projections are unrealistic because the independent automobile parts aftermarket is a "mature market," characterized by a slowdown in sales growth because the products have achieved acceptance by buyers. *See*

Revised Decl. of Richard A. Lancioni, 10/8/02 ("Lancioni Decl."), ¶¶ 12–13. Because the market is mature, every customer already has an existing supplier, and the only way GM can increase market share is by taking customers away from competitors.[12] *Id.* ¶ 17.

36. GM is unlikely to capture thirty-four percent of the independent automobile parts aftermarket. While GM has a thirty percent share of the current domestic automobile market, it currently has less than a four percent share of the automobile parts aftermarket. Lancioni Decl. ¶ 28.

37. Lancioni also references declining sales in the automobile afterparts market that GM itself highlighted during a DDG presentation. GM attributed the declining trend to improved vehicle quality, which results in repairs being pushed further in the vehicle's life cycle, as well as longer intervals between required maintenance visits and the replacement of mechanical parts with electronic parts. *See* Lancioni Decl. ¶ 16.

38. According to Lancioni, GM's optimistic projections of Stevens Beil's ability to increase sales of its AC Delco parts under the DDG program are not reasonably attainable. *See* Lancioni Decl. ¶¶ 28–33. Indeed, in the saturated Philadelphia DMA, Lancioni views the goals of the DDG program as "impossible." *Id.* ¶ 36.

---

10. James A. Anderson is the President and founder of Urban Science Applications, Inc., a consulting and software development company headquartered in Detroit, Michigan. *See* Anderson Decl. ¶ 1. Anderson's work "has primarily been in an area known as dealer network analysis which consists of determining the proper number and location of outlets necessary to adequately serve a market and evaluating the performance of existing outlets in the network." *Id.* ¶ 4.

11. Market penetration, or market share, "is a direct measure of competition on the market place," and, in this case, is based on AC Delco's ratio of their national sales to all automotive aftermarket national sales. Anderson Decl. ¶ 29.

12. Lancioni provides examples of numerous competitors, including NAPA and CarQuest, that already have "all makes/all models" automobile product lines and sophisticated distribution channels. *See* Lancioni Decl. ¶¶ 21–24.

39. Lancioni estimates that implementation of the DDG program will result in Stevens Beil's loss of at least $11 million dollars, *see* Lancioni Decl. ¶¶ 37, 49, which constitutes approximately forty percent of its total sales, *see* Beilowitz Decl. ¶ 25.

40. This Court finds Lancioni's characterization of the automobile afterparts market to be credible and persuasive. GM has not offered expert testimony to rebut Stevens Beil's projected loss of $11 million under the DDG program, and GM's own view of the afterparts market as a declining one supports Lancioni's conclusions.

41. According to Beilowitz, Stevens Beil could not sustain a loss of this magnitude without going out of business, Beilowitz Decl. ¶¶ 30, 34, 38, and laying off employees, *id.* ¶ 39.

42. Beilowitz's position is supported by GM's own internal correspondence, in which Scott Mackie, a General Sales Manager at AC Delco, *see* Dep. of Scott Mackie, 9/10/02 ("Mackie Dep."), 4:22, explains his impression of Beilowitz: "[H]e couldn't survive without AC Delco and the dealer opportunity that presents him. *I can't imagine he'll be a long-term survivor in the DDG mix.*" App. of Pl.'s Exs., Ex. 10 (emphasis added).

43. GM has informed Beilowitz that if he refuses to sign the new distribution agreement, Stevens Beil will lose its status as an authorized AC Delco distributor. Beilowitz Decl. ¶ 37.

44. On August 1, 2002, AC Delco implemented the DDG program nationwide. *See* Decl. of David Danna, 10/31/02 ("Danna Decl."), ¶ 5. Almost all one hundred of AC Delco's designated DDG distributors signed the DDA.[13] *Id.*

45. Beilowitz did not sign the DDA, but he expressed his desire to continue to be an AC Delco distributor. Danna Decl. ¶ 9; Payerle Certif., Ex. 127.

46. Beilowitz's Direct Account Supply Agreement with AC Delco expired as of December 31, 2000, *see* Payerle Certif., Ex. 122.

47. By letter dated May 14, 2001, Scott Mackie notified Beilowitz that AC Delco was extending Stevens Beil's Direct Account Supply Agreement on the same terms and conditions as contained in their previous 1999 agreement, until the implementation of the DDG program. *See* Payerle Certif., Ex. 122.

48. David Danna, one of AC Delco's Assistant General Managers, confirmed AC Delco's continuing relationship with Stevens Beil by letter dated August 26, 2002. *See* Payerle Certif., Ex. 147. Danna advised Beilowitz that as of August 1, 2002, the date the DDG program was implemented nationwide, Stevens Beil's Direct Account Supply Agreement had expired and that AC Delco expected Beilowitz's compliance with the DDA. *See id.;* Danna Decl. ¶ 9.

49. Beilowitz received a letter of notice on October 10, 2002 from Jim Obremski, AC Delco's Northeast Sales Manager, indicating that Stevens Beil was in violation of the DDG program. *See* Second Supplemental Decl. of Steven Beilowitz, 11/12/02 ("Sec. Supp'l Beilowitz Decl."), Ex. N; Payerle Certif., Ex. 139.

50. As explained in Obremski's correspondence, for violations of the DDG program, sanctions against a distributor may include any or all of the following:

---

**13.** Some of the participating members of the DDG sent letters to customers outside of their assigned DMA's, explaining that they "are prohibited from selling AC Delco" to them. *See* Payerle Certif., Exs. 126 & 132. One such company regretfully explained in its mailing that "we anticipate many of our customers may be outraged at this new mandate imposed on us." *Id.,* Ex. 126.

Loss of Discounts, Incentives and Allowances

Loss of Credit Terms

Termination of Applicable Branch Location

Termination of AC Delco Dedicated Distribution Agreement

Sec. Supp'l Beilowitz Decl., Ex. N; Payerle Certif., Exs. 133, 139.

51. GM contends that Beilowitz has substantial personal assets and, thus, has the ability to withstand any negative effects that the DDG program may have on his business until this action is finally decided on the merits. *See* Def.'s Br. in Oppos. to Applic. for Prelim. Inj., pp. 37–41; Payerle Certif., Ex. 101.

52. According to Samuel Kursh, however, Beilowitz's expert financial witness, Stevens Beil could be expected to incur pre-tax operating losses between $1,000,000 and $1,612,069 during the first three years of operation under the DDG Program.[14] *See* Supp'l Decl. of Samuel J. Kursh, 11/12/02 ("Supp'l Kursh Decl."), ¶ 7.

53. Kursh notes that "defendant's position requires Steven Beilowitz, an individual, to assume all risks and subsidize all potential losses of AC Delco's untried business strategy." Supp'l Kursh Decl. ¶ 7.

54. As explained in the conclusions of law which follow, GM's position is legally untenable because it would impose an affirmative duty on Stevens Beil to operate at a substantial financial loss while GM implements an "untried business strategy." Such conduct, if allowed, would defeat the legislative rationale upon which the NJFPA is based.

## III. CONCLUSIONS OF LAW

■ 1. In order to obtain a preliminary injunction, a plaintiff must demonstrate: (1) that he is reasonably likely to prevail eventually in the litigation; and (2) that he is likely to suffer irreparable injury without such injunctive relief. *See Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144, 157 (3d Cir.2002); *South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.* ("*SCCIA*"), 274 F.3d 771, 777 (3d Cir.2001).

2. If these two threshold showings are made, the Court must then consider, to the extent relevant: (3) whether an injunction would harm the defendant more than denying relief would harm the plaintiff; and (4) whether granting injunctive relief would serve the public interest. *See Tenafly Eruv,* 309 F.3d at 157 (citing *SCCIA,* 274 F.3d at 777).

### A. REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS

3. On an application for a preliminary injunction in the early stages of a case, the plaintiff need only "make a showing of reasonable probability, not the certainty, of success on the merits." *See Atlantic City Coin & Slot Serv. Co., Inc. v. IGT,* 14 F.Supp.2d 644, 657 (D.N.J.1998) ("*ACC & S*") (quoting *SK & F Co. v. Premo Pharm. Lab., Inc.,* 625 F.2d 1055, 1066 (3d Cir. 1980)).

4. Beilowitz must demonstrate a reasonable likelihood of success on his claim under the New Jersey Franchise Practices Act, N.J.S.A. §§ 56:10–1, *et seq.* ("NJFPA").

■ 5. Whether an agreement explicitly uses the term "franchise" does not determine the existence of a franchise. To establish a "franchise" under the NJFPA, a plaintiff must demonstrate the following: (1) a "community of interest" between the

---

**14.** These financial projections differ, depending on the percentage of assumed annual growth. *See* Supp'l Kursh Decl. ¶ 7.

franchisor and the franchisee; (2) the franchisor's grant of a "license" to the franchisee; and (3) the parties' contemplation that the franchisee would maintain a "place of business in New Jersey." *ACC & S*, 14 F.Supp.2d at 658; N.J.S.A. §§ 56:10–3, 10–4.

6. Additionally, the NJFPA applies only to franchises:

(2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise.

N.J.S.A. § 56:10–4 (West 2002).

7. Stevens Beil satisfies the sales requirements of N.J.S.A. § 56:10–4 because his 2001 sales, at $27.5 million, *see* Beilowitz Decl. ¶ 2, far exceeded the $35,000.00 minimum. Likewise, with an inventory which consists of over ninety-seven percent in AC Delco parts, *see id.* ¶ 3, Stevens Beil derives far in excess of the required twenty percent of its revenue from sales of AC Delco merchandise.

### Whether a "Community of Interest" Exists Between Stevens Beil and AC Delco.

8. A "community of interest" requires more than the mere fact that two parties share in the profits realized when a product makes its way from a manufacturer to the ultimate consumer. *See Colt Indus., Inc. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117, 120 (3d Cir.1988).

9. "What characterizes community of interest is the potential for abuse that is triggered 'when the reputation and good will of the network, created primarily by the efforts of each of the individual franchisees, passes back to the franchisor without compensation to the franchisee.'" *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 358, 614 A.2d 124, 142 (1992) ("*ISI*") (quoting *Neptune T.V. & Appliance Serv., Inc. v. Litton Sys., Inc.*, 190 N.J.Super. 153, 164, 462 A.2d 595, 601 (App.Div.1983)).

10. A "community of interest" exists when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skill that will be of minimal utility outside the franchise. *ISI*, 130 N.J. at 359, 614 A.2d at 142.

11. Franchise-specific investments are usually tangible capital investments, such as a building designed to meet the style of the franchise, special equipment useful only to produce the franchise product, and franchise signs. *See ISI*, 130 N.J. at 356, 614 A.2d at 141. Franchise specific-investments, however, may also include intangible assets, such as the business goodwill associated with operating under the franchisor's name. *Id.*

12. The most substantial franchise-specific investment that Beilowitz has made is in an inventory of $4.5 million worth of AC Delco products. Beilowitz Decl. ¶ 11.

13. Beilowitz has also made franchise-specific investments of more than $1 million in Stevens Beil's physical premises, as well as in a $500,000 customized computer system designed to track AC Delco part numbers, *see* Beilowitz Decl. ¶ 21.

14. During oral argument on the application for a preliminary injunction, counsel for GM argued that all of these franchise-specific investments in AC Delco will retain their value if Stevens Beil participates in the DDG program. *See* Tr. of Oral Arg. 62:12 to 63:25.

15. GM's argument is circular and without merit. As counsel for Stevens Beil pointed out at oral argument, these franchise-specific investments only have

value to Beilowitz if he participates in the DDG program. *See* Tr. of Oral Arg., 106:6–16. The very reason Beilowitz seeks a preliminary injunction is to retain the value of these investments by continuing to be an AC Delco distributor on the terms and conditions previously in force between the parties.

16. Thus, Beilowitz has made a substantial franchise-specific investment in AC Delco inventory, as well as in a customized computer system used to track AC Delco parts. Undoubtedly, these investments will be of minimal utility outside of an AC Delco franchise.

17. Beilowitz has also made a substantial investment in franchise-specific skills that would be of minimal utility without an AC Delco franchise. As Beilowitz explained, "I have invested my own professional career in my relationship with GM. My knowledge of AC Delco products, inventory control and pricing is my most valuable credential." Beilowitz Decl. ¶ 22.

18. Stevens Beil has enhanced the goodwill of AC Delco by selling its products for over twenty-three years, *see* Beilowitz Decl. ¶ 4, and increasing AC Delco product sales from $8.4 million in 1990 to $27.5 million by 2001, *see id.* ¶ 10.

19. Even AC Delco commended Beilowitz's "tremendous" performance by awarding him a year's use of a luxury vehicle and a trip to Switzerland. *See* App. of Pl.'s Exs., Exs. 51–52.

20. In addition to AC Delco product sales, Beilowitz has also enhanced AC Delco's goodwill by sponsoring local events with the AC Delco mark prominently displayed alongside the "Stevens Beil" name. *See* Supp'l Beilowitz Decl. ¶¶ 4–5, Exs. B, C; Beilowitz Decl., Exs. F & G.

21. Stevens Beil's hosting of instructional automotive clinics at its Pennsauken location, sponsored by AC Delco, also enhances AC Delco's goodwill. *See* Beilowitz Decl., Ex. D.

22. Stevens Beil's large customer territory itself speaks to Stevens Beil's extensive goodwill. As Mr. Langer, Beilowitz's counsel, explained at oral argument, "it's not an accident" that distant customers with their own local AC Delco distributors choose to buy parts from Stevens Beil in New Jersey. Tr. of Oral Arg., 107:9–12. "It's because of the goodwill and the service that's engendered by what Mr. Beil[owitz] does that [that] occurs." *Id.*

23. At oral argument, Mr. Langer emphasized that AC Delco exercises control over Stevens Beil's sales by issuing pricing tapes containing suggested price ranges for AC Delco products. *See* Tr. of Oral Argument, 15:1–14. Judge Brotman explained in *ACC & S*, however, that the so-called "control" test for "community of interest" was ultimately not adopted by the New Jersey Supreme Court. *Id.*, 14 F.Supp.2d at 661.

24. A community of interest may be demonstrated by the economic dependence of the alleged franchisee on the alleged franchisor, as evidenced by a high percentage of the franchisee's sales of the franchisor's product. *See ACC & S*, 14 F.Supp.2d at 663. In *ACC & S*, the court concluded that the plaintiff, which derived approximately seventy-six percent of its revenue from sales of the defendant's products, was a franchisee. *Id.* Similarly, in *ISI*, ninety-seven percent of the plaintiff's revenue came from the sale of the defendant's products. *Id.*, 130 N.J. at 365, 614 A.2d at 145.

25. Like the *ISI* plaintiff, over ninety-seven percent of Stevens Beil's business derives from sales of AC Delco auto parts. Beilowitz Decl. ¶¶ 2–3, 6.

26. Based on the significant amount of Stevens Beil's franchise-specific invest-

ments in AC Delco in the form of inventory, a computer system, and goodwill, as well as on the economic interdependence of the two entities, I conclude that a community of interest exists between Stevens Beil and GM.

### Whether AC Delco Granted Stevens Beil a "License"

27. The NJFPA requires a plaintiff to show that it has been granted "a license to use a trade name, trade mark, service mark, or related characteristic[ ] ..." N.J.S.A. § 56:10–3(a) (West 2002).

28. In order to establish a "license" under the NJFPA, the franchisee must, at a minimum, use the name of the franchisor "in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the ... licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee." *ISI*, 130 N.J. at 352, 614 A.2d at 139 (citing *Neptune T.V.*, 190 N.J.Super. at 160, 462 A.2d at 599.)

29. There is clearly some connection in the public mind between Stevens Beil and AC Delco. In fact, many long-term clients of Stevens Beil equate the Stevens Beil name with AC Delco parts. *See* Supp'l Counsel Decl., Ex. B.

30. Under the terms of the 1999 Direct Account Supply Agreement between Stevens Beil and AC Delco, Stevens Beil has the explicit authority to use the AC Delco mark:

> During the term of this Agreement, AC Delco hereby grants to the Direct Account a royalty-free right to use the trademarks, logos, emblems, and indicia of origin, including but not limited to, those indicated as Authorized Product Lines and such other trademarks and

service marks ... solely in connection with the marketing of the Product.

App. of Pl.'s Exs., Ex. 2, § 2(B).

31. Under the same agreement, "Direct Account agrees to purchase, maintain and prominently display exterior and interior AC Delco signage as allowed by local ordinance." App. of Pl.'s Exs., Ex. 2, § 2(D). Delivery vehicles are also directed to have "proper AC Delco logo identification." *Id.*

32. For purposes of the NJFPA, a license may be found to exist based on a longstanding business relationship, even absent an explicit contractual grant of authority. *See Cooper Distributing Co., Inc. v. Amana Refrigeration Inc.*, 63 F.3d 262, 272–73 (3d Cir.1995); *see also Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 471 (D.N.J.1998) (Orlofsky, J.) ("*LCC*") (finding grant of license based on evidence that plaintiff included trademark on billboards, vehicles and brochures).

33. In addition to its explicit license to use the AC Delco mark per the Direct Account Supply Agreement, Stevens Beil has liberally used the AC Delco mark over the course of its history as an AC Delco distributor. *See, e.g.*, Supp'l Beilowitz Decl., Exs. A–C (showing display of AC Delco mark alongside "Stevens Beil" at Beilowitz's Pennsauken facility, the "Pocono 500" automobile race, and on a parade float); Beilowitz Decl. ¶¶ 17, 20, Ex. E (showing display of AC Delco mark on Stevens Beil business cards, stationery and invoices).

34. Based on the terms of the Supply Agreement and Beilowitz's prominent, long-term use of the AC Delco mark, I conclude that Beilowitz had a "license" within the meaning of the NJFPA.

### Whether Stevens Beil Maintains a "Place of Business" in New Jersey

35. The NJFPA applies only to a franchise "the performance of which contem-

plates or requires the franchisee to establish or maintain a place of business within the State of New Jersey." N.J.S.A. § 56:10–4(1) (West 2002).

36. A "place of business" is "a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services. Place of business shall not mean an office, a warehouse, a place of storage, a residence or a vehicle." N.J.S.A. § 56:10–3.

37. Stevens Beil is located at 7101 Airport Highway, Pennsauken, New Jersey. *See* Beilowitz Decl. ¶ 1.

38. At Stevens Beil's Pennsauken location, twenty-three sample products of AC Delco product lines are displayed for sale. *See* Supp'l Beilowitz Decl., ¶ 2, Ex. A.

39. Lancioni, who visited the Pennsauken facility, observed the operations at Stevens Beil, which include: a warehouse, an order processing center, an order preparation center, an expediting department, an inventory record keeping group, a sales department, administrative offices, a front sales desk, a computer center, and a shipping and transportation department. *See* Lancioni Decl. ¶¶ 52(a)-(j).

40. The AC Delco contract itself requires Stevens Beil to maintain and staff a "will call" counter to serve secondary customers. *See* Beilowitz Decl., Ex. A, § 2D(3).

41. Customers who choose to pick up items at the front counter typically call ahead so that the item and invoice are ready for them upon arrival. Supp'l Beilowitz Decl. ¶ 3. Some customers show up without having called ahead of time. *Id.*

42. In *Cooper Distributing*, the Third Circuit explained that a "place of business" can exist even without the consummation of sales at the facility or order taking. *Id.*, 63 F.3d at 274–75, n. 14. The court found that a facility used for regular product demonstrations qualified as a "place of business" under the NJFPA. *Id.* at 274–75; *see also ISI*, 130 N.J. at 351, 614 A.2d at 138 (finding place of business where plaintiff gave demonstrations of defendant's software product at its New Jersey facility).

43. GM contends that Stevens Beil's Pennsauken facility is nothing more than a warehouse. As Lancioni observed, however, the warehouse is but one component of the extensive business operations at Stevens Beil's Pennsauken facility. *See* Lancioni Decl. ¶¶ 52(a)-(j).

44. Because customers regularly purchase and pick-up AC Delco products at the facility, I find that Stevens Beil maintains a "place of business" in New Jersey within the meaning of the NJFPA.

45. Additionally, like the plaintiffs in *Cooper Distributing* and *ISI*, Stevens Beil hosted a number of instructional clinics at its Pennsauken location, prominently sponsored by AC Delco, on topics of automotive maintenance and repair. *See* Beilowitz, Ex. D. This provides further evidence of Beilowitz's New Jersey place of business.

### Likelihood of Success Under NJFPA

46. Having concluded that Stevens Beil is an AC Delco franchise within the meaning of the NJFPA, I must now consider whether Beilowitz is reasonably likely to ultimately prevail on the merits of his claims under the NJFPA. *See Tenafly Eruv*, 309 F.3d at 157.

47. Under N.J.S.A. § 56:10–7(e), it is a violation of the NJFPA for a franchisor "to impose unreasonable standards of performance upon a franchisee."

48. I conclude that it is reasonably likely that the DDG program will be found to impose an unreasonable standard of performance on Stevens Beil because it requires Stevens Beil to sacrifice $11 million in sales outside the Philadelphia DMA,

which constitutes approximately forty percent of Stevens Beil's overall sales. *See* Lancioni Decl. ¶¶ 37, 49; Beilowitz Decl. ¶ 25.

49. Moreover, I also conclude that Stevens Beil is reasonably likely to incur pretax operating losses between $1,000,000 and $1,612,069 during the first three years of operation under the DDG Program. *See* Supp'l Kursh Decl. ¶ 7.

50. It is clearly an "unreasonable standard of performance" within the meaning of the NJFPA to require a franchisee to operate at a substantial financial loss while the franchisor attempts to implement a new and unproven marketing strategy.

51. Additionally, under N.J.S.A. § 56:10–5, a franchisor's termination, cancellation, or failure to renew a franchise without good cause is prohibited. *Id.*

52. New Jersey takes a restrictive view of what constitutes "good cause" for termination. "It is a violation of the NJFPA to cancel a franchise for any reason other than the franchisee's substantial breach, even if the franchisor acts in good faith and for a bona fide reason." *ACC & S*, 14 F.Supp.2d at 658 (citing *Westfield Centre Serv., Inc. v. Cities Serv. Oil Co.*, 86 N.J. 453, 469, 432 A.2d 48, 55 (1981)).[15]

53. GM has not alleged that Stevens Beil substantially breached the Direct Account Supply Agreement. Indeed, there is absolutely no evidence of such a breach, and GM has generously lauded Beilowitz for his successful sales achievements in one of GM's internal trade publications, *see*, Sec. Supp'l Beilowitz Decl., Ex. H, and awarded Beilowitz two prizes for his outstanding sales performance, *see* App. of Pl.'s Exs., Exs. 51–52.

54. It is also undisputed that a change in business strategy was the primary moti-

vation behind GM's implementation of the DDG program. *See* Payerle Certif., Ex. 149l; Supp'l Beilowitz Decl., Ex. N.

55. Because GM has offered no reason, other than a change in its business strategy, for its failure to renew the AC Delco franchise with Stevens Beil after their twenty-three-yearlong business relationship, I conclude that Beilowitz has a reasonable likelihood of success on his claims under N.J.S.A. § 56:10–5.

## B. IRREPARABLE HARM

56. The second area of inquiry which this Court must consider in deciding whether to grant a preliminary injunction is whether the plaintiff faces irreparable injury if injunctive relief is not granted. *See Tenafly Eruv*, 309 F.3d at 157.

■ 57. It is almost axiomatic that purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement. *See Frank's GMC Truck Ctr. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988).

58. In some cases, however, economic injury can be so severe as to warrant preliminary injunctive relief: "[T]he loss of business and good will, and the threatened loss of the enterprise itself, constitute irreparable injury to the plaintiff sufficient to justify the issuance of a preliminary injunction." *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 233, 236 (D.N.J.1976); *see also Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) ("[T]he right to continue a business in which [plaintiff] had engaged for twenty years ... is not measurable in monetary terms."); *ACC & S*, 14 F.Supp.2d at 667–68.

---

**15.** Compared to other states with similar franchise practices acts, New Jersey takes a narrow view of the circumstances that may justify termination of a franchisee. *See Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1185 (2d Cir.1995).

59. Moreover, the Third Circuit recognizes loss of market share as a form of irreparable injury that may warrant the grant of a preliminary injunction. *See Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.,* 290 F.3d 578, 596 (3d Cir.2002).

■ 60. Under the DDG program, Stevens Beil cannot make sales to customers outside the Philadelphia DMA and, thus, stands to lose at least $11 million dollars, which represents approximately forty percent of its total revenue. *See* Beilowitz Decl. ¶ 25; Lancioni Decl., ¶ 49. Moreover, Stevens Beil is reasonably likely to incur pre-tax operating losses of at least $1 million during the first three years of operation under the DDG Program. *See* Supp'l Kursh Decl. ¶ 7.

61. These are substantial losses. A forty percent reduction in revenue would be insufficient to cover Stevens Beil's payroll, insurance, and day-to-day operating expenses. *See* Beilowitz Decl. § 38. Beilowitz would not be able to maintain the inventory and delivery services upon which his business is based. *Id.*

62. In Beilowitz's view, the DDG program would immediately destroy his business. Beilowitz Decl. ¶ 38. This is not an unreasonable belief, considering the $11 million loss that Stevens Beil faces if Beilowitz loses all customers outside of the Philadelphia DMA, a fact which has not been rebutted by GM. Beilowitz is likely to suffer at least $1 million in pre-tax operating losses during the first three years of the DDG program. *See* Supp'l Kursh Decl. ¶ 7.

63. If Stevens Beil's AC Delco franchise is terminated or restricted, this is also likely to result in Stevens Beil losing market share. Already, competitors assigned to the Philadelphia DMA have begun to solicit Beilowitz's existing customers. *See* Sec. Supp'l Beilowitz Decl., Exs. A & C.

64. GM itself has recognized, perhaps unwittingly, that Stevens Beil is unlikely to survive without AC Delco or "be a long–term survivor in the DDG mix." App. of Pl.'s Exs., Ex. 10.

65. GM contends that Stevens Beil has sufficient assets to withstand, pending a final determination of this action on the merits, any adverse economic effect that the DDG program is likely to have on Stevens Beil. *See* Tr. of Oral Arg., 90:13–15.

66. GM also argues that because Stevens Beil is an unincorporated sole proprietorship, Beilowitz's personal assets are appropriately considered in this Court's assessment of irreparable harm. *See id.,* 90:22 to 92:25;. Def.'s Br. in Oppos. to Applic. for Prelim. Inj., p. 38.

67. In essence, GM is asking Beilowitz, the owner of a successful business, to transform his business into a money–losing operation at his personal expense and risk, until a final determination of this action on the merits. As Plaintiff's expert, Dr. Samuel Kursh, explained, GM's position "requires Beilowitz, an individual, to assume all risks and subsidize all potential losses of AC Delco's untried business strategy." Supp'l Kursh Decl. ¶ 7.

68. GM has cited no case law to support its argument that Beilowitz's personal assets may be considered in assessing the question of irreparable harm for purposes of granting or denying a preliminary injunction.

69. GM's position, which would force Stevens Beil to operate at a loss, is untenable as a matter of logic and public policy because it would permit any powerful franchisor to make an end-run around the protections that the NJFPA affords to franchisees. Under GM's theory, a franchisor could drive a franchisee to financial

ruin by adopting a new, financially destructive, "business strategy."

70. A business may be faced with irreparable harm even if the sole owner of the business, or, in the case of a corporation, the shareholders, are individually wealthy. Beilowitz's personal wealth and the form in which he does business are simply irrelevant considerations under the NJFPA.[16]

71. Beilowitz has demonstrated a likelihood of irreparable injury if he is not granted preliminary injunctive relief. Stevens Beil stands to lose forty percent of its revenue if such relief is not granted. Absent the grant of preliminary injunctive relief, Stevens Beil's business operations would be severely impaired, if not destroyed.

## C. HARM TO THE NON–MOVING PARTY

■ 72. The third element of a preliminary injunction analysis requires this Court to assess whether granting a preliminary injunction would harm GM more than denying preliminary injunctive relief would harm Beilowitz. *See Tenafly Eruv*, 309 F.3d at 157.

73. Beilowitz has quantified the amount of harm that the DDG program will have on Stevens Beil's sales as at least $11 million dollars, approximately forty percent of its total sales. *See* Beilowitz Decl. ¶ 25; Lancioni Decl. ¶ 49.

74. GM has not quantified the amount of harm, if any, that GM will suffer if a preliminary injunction is granted in favor of Beilowitz.

75. As the world's largest vehicle manufacturer, *see* GM Company Profile, *supra*,

at ¶ 2, GM has sufficient assets to withstand any negative impact that may befall it pending the final outcome of this action.

76. If anything, GM stands to derive an economic benefit if Stevens Beil continues to sell AC Delco auto parts.

77. At oral argument, Mr. Payerle, GM's counsel, presented the DDG program as a *quid pro quo*. *See* Tr. of Oral Arg. 85:5–9. A *quid pro quo* refers to "the giving [of] one valuable thing for another." *Black's Law Dictionary* 1248 (6th ed.1990).

78. The record before this Court is very clear, however, that the DDG program requires Stevens Beil to sacrifice "a lot of *quid*," to the tune of $11 million, for an undetermined *quo:*

> MR. PAYERLE: I am suggesting, yes, there is a *quid pro quo* going on here and that that *quid pro quo* follows from the restriction of sales by Mr. Beilowitz outside of the DMA which he claims represents 40 percent of his business.
>
> THE COURT: Okay, well he's telling me that the *quid* is 40 percent.
>
> MR. PAYERLE: That's right.
>
> THE COURT: How much is the *quo?*
>
> MR. PAYERLE: We don't have a *quo* yet, your Honor.

Tr. of Oral Arg. 85:5–14.

79. Accordingly, this third factor in the preliminary injunction calculus tips in Beilowitz's favor. In this *quid pro quo* regime imposed by the DDA, GM has not identified the amount of "*quo*" that Stevens Beil stands to gain if it participates in the DDG Program at a substantial financial loss. *See* Tr. of Oral Argument, 110:21 to 111:7.

---

16. At oral argument, the Court asked GM whether it should make a difference that Beilowitz brings this application for a preliminary injunction as a sole proprietorship, rather than as a sole shareholder of a corporation.

*See* Tr. of Oral Arg. 91:24 to 92:6. GM's counsel necessarily conceded, "I'm not suggesting that the result would be different." *Id.* 92:7–8.

## D. PUBLIC INTEREST FACTORS

80. The fourth and final factor to be considered prior to granting a preliminary injunction is whether granting such relief would serve the public interest. *See Tenafly Eruv*, 309 F.3d at 157.

81. The NJFPA was enacted because "distribution and sales through franchise arrangements in the State of New Jersey vitally affect[ ] the general economy of the State, the public interest and the public welfare." N.J.S.A. § 56:10–2.

82. As the Supreme Court of New Jersey has explained, "the Act reflects the legislative concern over long-standing abuses in the franchise relationship, particularly provisions giving the franchisor the right to terminate, cancel or fail to renew the franchise." *Shell Oil Co. v. Marinello*, 63 N.J. 402, 409, 307 A.2d 598, 602 (1973).

83. To the extent that a preliminary injunction in this case will promote the policy behind the NJFPA, this furthers the public interest.

84. A preliminary injunction would also serve the public interest to the extent it prevents a successful New Jersey business from having to close its doors and lay off employees. *See* Beilowitz Decl. ¶ 39.

85. In summary, all four of the factors this Court must consider in deciding whether to grant preliminary injunctive relief warrant the grant of such relief to Beilowitz, who has demonstrated both a likelihood of ultimate success on the merits and irreparable injury absent relief. GM will not suffer greater harm upon a grant of preliminary injunctive relief than Beilowitz would suffer absent such relief. Finally, relief in this case is consistent with the public policy underlying the NJFPA.

17. The amount of the bond is left to the discretion of the District Court. *See ACC & S*, 14 F.Supp.2d at 672 (citing *Frank's GMC*, 847 F.2d at 103); Fed.R.Civ.P. 65(c). Based on

## IV. CONCLUSION

For the reasons set forth above, the motion of Plaintiff, Steven I. Beilowitz, for a preliminary injunction against Defendant, General Motors Corporation, shall be granted, according to the terms specified in this Court's accompanying Order. In addition, pursuant to Fed.R.Civ.P. 65(c), Plaintiff shall post security in the amount of $2,500 [17] with the Clerk of this Court, "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." *Id.* The Court shall enter an appropriate form of order.

the financial information produced to this Court, a $2,500 surety constitutes sufficient security in this case.